**A. DUIE PYLE, INCORPORATED and A. E. F. Transportation, Incorporated, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Local 107, Local 384, Local 470, Local 312, Local 331 and Local 676 each Affiliated With the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenors.**

No. 16010.

United States Court of Appeals Third Circuit.

Argued March 7, 1967.

Decided Aug. 15, 1967.

Robert H. Kleeb, Morgan, Lewis & Bockius, Philadelphia, Pa. (Peter D. Walther, David A. Leff, Philadelphia, Pa., on the brief), for petitioners.

Paul Spielberg, N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Atty., National Labor Relations Board, on the brief), for respondent.

Edward Davis, Philadelphia, Pa. (David Previant, Milwaukee, Wis., Howard S. Simonoff, Camden, N. J., on the brief), for intervenors.

Before McLAUGHLIN, HASTIE and FREEDMAN, Circuit Judges.

OPINION OF THE COURT

FREEDMAN, Circuit Judge:

This is a petition to review a decision and order of the National Labor Relations Board that certain provisions of a collective bargaining agreement dealing with subcontracting did not violate the hot cargo proscription of the Landrum-Griffin Act, which added § 8(e) to the National Labor Relations Act.[1]

Petitioners are common carriers and as members of a multiemployer bargaining association are parties to a collective bargaining agreement with local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The agreement contains a number of provisions dealing with carrier subcontracts to individuals who own and operate truck-tractors and tractor-trailers. An owner who operates his own equipment is known as an owner-operator, and an owner who has more than one piece of equipment and employs one or more drivers is known as a fleet-owner. The subcontracting arrangements are carried out by a lease of the equipment which also includes the services of the driver. Since the subcontractees do not have the requisite permits they may transport goods in interstate commerce only while working for certificated interstate carriers such as petitioners.

The 1963 collective bargaining agreement, the one before us, contains detailed regulations of the treatment of owner-operators and fleet-owners, including the setting of minimum wages and minimum lease rentals and provision for seniority rights, insurance and the sale of equipment at its true value.[2] It expressly states that its object is to assure the payment of union wage scales and to prevent their circumvention through reduction of wage scales in the guise of absorption of loss from the operation of equipment.[3] Another provision of the agreement, not in question here, requires that no work presently performed by or later assigned to the bargaining unit shall be subcontracted unless all regular employees are working.[4] A related provision, also unchallenged, provides that the petitioners may not lease or hire outside equipment unless all of their available usable equipment is working, and bars the use of outside equipment while regular employees are on layoff.[5] A final provision, which is the center of the present controversy and was newly added in 1963, requires that leased equipment must be operated in all cases by an "employee" of the carrier, who must be paid "pursuant to the terms" of the collective bargaining agreement, and that the employer shall reserve the right to control the manner, means and details by which the owner-operator performs his service, as well as the ends thereby accomplished.[6] It is undisputed that the newly added provision would change the status of nonunionized owner-operators and fleet-owners from independent contractors to employees and thus would require them to become union members because of the union security provision of the agreement.[7]

The Board concluded that the agreement did not violate § 8(e) and that the provisions here in question, providing in detail for the terms and conditions of employment of owner-operators and requiring employee status of them, were simply designed to protect unit work and standards from erosion by unregulated subcontracts to owner-operators and fleet-owners. It also decided that the requirement that the operators of all leased equipment must be employees was not invalid simply because it had the incidental effect of requiring the subcontractees to become members of

1. 29 U.S.C. § 158(e).

2. Article 24 of the Over-the-Road Agreement.

3. Article 24, § 16.

4. Article 33.

5. Article 34.

6. Article 1, § 2(c) and Article 24, § 4.

7. Article 2, § 1(b).

the union. Highway Truck Drivers and Helpers, Local 107, 159 N.L.R.B. No. 1 (1966). Petitioners, however, contend that the union in the guise of protecting legitimate rights of the bargaining unit has reached out to coerce the owner-operators and fleet-owners to become unionized on pain of losing their sub-contracts. This they contend renders invalid under § 8(e) the provisions of the agreement, especially those requiring the subcontractees to become employees and thereby to join the union.

Section 8(e) makes it an unfair labor practice for a union and an employer to agree that the employer shall cease and refrain from handling, using, selling, transporting, or otherwise dealing in the products of another employer, "or to cease doing business with any other person." The Act declares invalid a provision made in violation of its prohibition.[8]

At the threshold of our inquiry is the question whether the agreement requires a cessation of business with the owner-operators and fleet-owners since by its terms it would permit them to retain the work if they became employees of the carrier and joined the union. The requirement that the owner-operators and fleet-owners must become employees of the carriers prohibits a carrier by implication from doing business with those who do not become its employees and thus requires it "to cease doing business" within the meaning of § 8(e). General Teamsters', Warehouse-men and Helpers' Union, Local No. 890, 137 N.L.R.B. 641, 643–44 (1962).[9] It is no answer to say that if the subcontractees become employees and join the union the carriers will not be required to cease doing business with them. While it is true that not every incidental alteration in the relationship between the parties to the subcontract would rise to the extent of constituting an agreement to cease doing business, the provisions before us are so drastic in their impact on the continued relationship of the independent subcontractees with the carriers that they fall clearly within the area regulated by § 8(e).[10]

The scope of the prohibition of § 8(e), however, is not to be found in the literal meaning of its broad language, but rather in its history and the circumstances out of which it arose, all of which has recently been described authoritatively by the Supreme Court in National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). The Court there showed that § 8(e) was enacted to close a "loophole" in § 8(b) (4) (A), which the Court in the *Sand Door* case[11] had construed as permitting an employer to carry out voluntarily a hot cargo provision. Section 8(e) therefore made it an unfair labor practice merely to enter into such an agreement, which it declared void. The setting in which § 8(e) was adopted thus requires it to be construed in harmony with § 8(b) (4) and this carried into § 8(e) the dis-

8. The relevant portion of § 8(e) reads: "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void. * * *" 29 U.S.C. § 158(e).

9. See also Local No. 825, International Union of Operating Engineers, 162 N.L.R.B. No. 155 (1967); Dan McKinney Co., 137 N.L.R.B. 649, 652 (1962).

10. See Local 3, International Brotherhood of Electrical Workers, 140 N.L.R.B. 729, 730 (1963), enforced, 325 F.2d 561 (2 Cir. 1963); cf. Retail Clerks Union Local 770 v. NLRB, 296 F.2d 368, 372–373 (D.C.Cir.1961). See also § 8(b) (4) (A), prohibiting secondary boycotts having as an object "forcing or requiring any employer or self-employed person to join any labor * * * organization * * *." 29 U.S.C. § 158(b) (4) (A).

11. Local 1976, United Brotherhood of Carpenters & Joiners of America v. NLRB, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

tinction made in § 8(b) (4) between so-called "primary" and "secondary" activities. National Woodwork Manufacturers Association v. NLRB, supra; Houston Insulation Contractors Association v. NLRB, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967).[12] If the object of the agreement is to benefit the employees of the bargaining unit represented by the union, it is "primary" and in such event does not fall within the proscription of § 8(e), whereas if the object is the application of pressure on an outside employer in order to require him to accede to union objectives it is "secondary" and within the prohibition of § 8(e).[13] Thus, in the *National Woodwork Manufacturers* case, the Supreme Court upheld as "primary" a provision that no employer would handle prefabricated doors, because it sought only to preserve work which traditionally had been performed by members of the bargaining unit on the job site.

█ In the present case the union has a legitimate interest in the subcontracts of the work which its members have the capacity to perform. The danger which such subcontracts have posed to the job security of bargaining unit members was recognized by the Supreme Court in the *Oliver* cases, Local 24, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), and 362 U.S. 605, 80 S.Ct. 923, 4 L.Ed.2d 987 (1960). The Court there dealt with provisions which were virtually identical to those involved here and held that they were immune from attack under state antitrust law because of the exclusive federal jurisdiction over the sub-

ject matter of the agreement. The Court recognized that the conditions under which a carrier could lease the equipment of an owner-operator had been in dispute for many years and that the owner-operators' practice of accepting inadequate rentals for their vehicles had endangered the maintenance of the union wage scales.[14] The Court considered these factors sufficient to require bargaining on the conditions of subcontracts granted by the carriers to owner-operators.[15] The Board therefore was justified in concluding that the present subcontracts were a legitimate concern of the union, subject to suitable regulation in the collective bargaining agreement.

Petitioners contend, however, that the provisions requiring the subcontractees to become employees of the carriers and thus to become members of the union are utterly unnecessary for the protection of the bargaining unit and therefore have a secondary and not primary objective. They point to the provision in the agreement that work assigned to the bargaining unit can be subcontracted only if all the regular employees are working. This provision, however, is static in nature and does not safeguard the rights of the unit employees in the event of an increase in the volume of work presently performed by owner-operators which the bargaining unit would prefer should fall to it. Similarly, the provision that the carriers will not lease or hire outside equipment unless all their available usable equipment is already at work and barring the use of outside equipment while regular employees are on layoff, does not protect the unit against a carrier's reduction in its equipment either by sale or by fail-

---

12. See generally, Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b) (4) and 8(e), 113 U.Pa.L. Rev. 1000 (1965); Comment, Subcontracting Clauses and Section 8(e) of the National Labor Relations Act, 62 Mich.L. Rev. 1176 (1964).

13. For the history of this distinction under § 8(b) (4) see Lesnick, The Gravamen of the Secondary Boycott, 62 Colum. L.Rev. 1363 (1962).

14. 358 U.S. at 291, 293–295, 79 S.Ct. 297.

15. Id., at 294–295; 362 U.S. at 606, 80 S.Ct. 923.

ure to replace obsolescent equipment.[16] Moreover, these provisions do not prevent the carrier from failing to replace employees who retire or otherwise leave the unit. These provisions therefore do not eliminate the appropriateness of additional safeguards in the collective bargaining agreement designed to protect the bargaining unit.

The Board found that the provisions of the agreement requiring that owner-operators and fleet-owners be compensated and treated in general as are union members employed by the carrier constituted the exaction of requirements designed to protect union standards against substandard competition which might be an incentive for an employer to deprive his unionized employees of work. Since the Board decided the present case on a stipulation of facts, the record is neither as complete nor as satisfactory as it might be. As the record is before us, however, we cannot say that the Board erred in concluding that the general union standards provision served a primary rather than a secondary objective, especially in light of the now prevalent view that union standards clauses are valid primary regulations.[17] It should be observed, however, that it is undesirable to determine the conscious objective of a union in obtaining the inclusion of a challenged provision in a collective bargaining agreement on a bare stipulation of facts which supplies no indication of purpose or intention beyond the language of the provision and the general bargaining history.

■ We come then to the remaining provision, that which requires owner-operators and fleet-owners to become employees and thus to join the union in order to retain the work which they have been doing on subcontract. On their face these requirements are "sec-

ondary" in their purpose as well as their result. They do not require a carrier to put an end to subcontracting, but only to terminate it as to its subcontractees who refuse to become members of the union. Thus, their effect is to make the continuance of the relationship between the employer and an independent contractor depend upon the latter's decision to become a member of the union if he is an owner-operator and to require his employees as well as himself to become members of the union if he is a fleet-owner. The requirement therefore makes the central test of the employer's continuing to do business with such an individual his internal labor policy and not his maintenance of union wage scales or similar conditions which otherwise might adversely affect the unit members. This is substantially similar to provisions which permit an employer to subcontract only with third parties who are unionized. Such provisions have repeatedly been struck down under § 8(e) as implementing illegal secondary objectives. See, e. g., NLRB v. Joint Council of Teamsters No. 38, 338 F.2d 23, 28, 30–31 (9 Cir. 1964); Meat & Highway Drivers, Dockmen, Helpers & Misc. Truck Terminal Employees, Local Union No. 710, etc. v. NLRB, 335 F.2d 709, 717 (D.C.Cir. 1964); District No. 9, International Association of Machinists v. NLRB, 114 U.S.App.D.C. 287, 315 F.2d 33, 36–37 (1962).

The present provisions, to the extent that they require the subcontractees to become employees and members of the union, therefore must also be declared invalid. As in the case of secondary boycotts generally, a union may not employ a collective bargaining agreement with one employer as a means of effectuating its object to coerce another employer to unionize. Nor may it by this means seek to coerce self-employed persons to become union members. Congress

---

16. See Local 24, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Oliver, 358 U.S. 283, 294, 79 S.Ct. 297 (1959).

17. See Meat & Highway Drivers, Dockmen, Helpers & Misc. Truck Terminal Employees, Local Union No. 710, etc. v. NLRB, 118 U.S.App.D.C. 287, 335 F.2d 709, 713, 715 and cases cited in n. 16 (1964).

has made this clear by § 8(b) (4) (A) which prohibits secondary boycotts with an object of "forcing or requiring any employer or self-employed person to join any labor * * * organization * * *." The self-employed owner-operator is as much entitled to protection from coercion to join a labor organization as is a fleet-operator who may have one or even many employees.

Nor may these requirements be justified on the assertion that they are the simplest and most effective method of assuring that union standards will be followed in the subcontracting operations. The union presented no evidence before the Board to show that the valid and severable union standards provisions of the collective bargaining agreement were inadequate to safeguard the maintenance of union standards and the Board has pointed to no rationale for its conclusion, but has made only the general observation that a complete prohibition of subcontracting would have had a comparable effect. The parties here, however, carefully refrained from prohibiting subcontracting and the provision requiring that the subcontractees become employees and join the union must therefore be judged as it was written and not as if it were a different case completely prohibiting all subcontracting. The agreement in effect recognizes subcontracting, and since there is nothing to show that the bargaining unit will not be fully protected by the exaction of union standards without affecting the labor practices of the subcontractees, the requirement that they must become employees and members of the union constitutes a reaching out for a "secondary" objective, which is proscribed by § 8(e).

The decision and order of the Board dismissing the complaint therefore will be vacated and the case remanded to the Board for further action in accordance with this opinion.

HASTIE, Circuit Judge (concurring).

I think that the case for vacating the Board's dismissal of the petitioners' complaint is stronger than the majority opinion makes it.

Specifically, the majority concede that the challenged provision of the collective bargaining agreement requiring that subcontractors become employees of the carriers and thus members of the union serves the legitimate function of providing significant added protection to the bargaining unit. In my view, that concession is unwarranted.

Article 30(b) of the City Cartage Agreement and Article 33(b) of the Road Agreement provide that "no work or services presently performed or hereafter assigned to the collective bargaining unit will be subcontracted". The majority read this clause as limited to the "volume" of work now performed by the bargaining unit. I think it is more reasonably read as protecting every type of work performed by the bargaining unit. So read, the clause precludes the employer from using either a diminution of the work force, or his refusal to hire needed additional men as work increases, as an excuse for the subcontracting of work. Thus, it seems to me that the only significant objective of the challenged requirement is the application of pressure on third persons, subcontractors, to accede to union demands.

Except in this one particular, I agree with the reasoning of the majority. Of course, I agree that the Board's order be vacated.