872

AMAX COAL COMPANY, a Division of
Amax, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Mine Workers of America, Local
No. 1854, and United Mine Workers of
America, Intervenors.

UNITED MINE WORKERS OF AMERI-
CA, LOCAL NO. 1854 and United Mine
Workers of America, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Amax Coal Company, a Division of
Amax, Inc., Intervenor.

Nos. 78–2310, 78–2489.

United States Court of Appeals,
Third Circuit.

Argued Oct. 18, 1979.

Decided Feb. 1, 1980.

As Amended Feb. 12, 1980.

Daniel F. Gruender (argued), and Philip M. Prince, Shimmel, Hill, Bishop & Gruender, P. C., Phoenix, Ariz., Raymond K. Denworth, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for Amax Coal Co.

Carol A. De Deo, Richard B. Bader (argued), Attys., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for National Labor Relations Board.

J. Craig Kuhn (argued), and Melvin P. Stein (argued), Pittsburgh, Pa., Harrison Combs, Gen. Counsel, Willard P. Owens, Counsel, United Mine Workers of America, Washington, D. C., Paul M. Puskar, Kuhn, Engle & Stein, Pittsburgh, Pa., for United Mine Workers of America.

* Judge Gibbons did not participate in the decision of the Court, although he heard oral argument.

Before GIBBONS * and HIGGINBOTHAM, Circuit Judges and ZIEGLER, District Judge.**

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This case is before the Court upon the petitions of Amax Coal Company, a division of Amax, Inc., (Amax or the Company) and the United Mine Workers of America (the Union or UMWA) to review an order of the National Labor Relations Board (the Board). The Board found that the Union violated the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, (the Act) by threatening to strike and by striking to coerce Amax into bargaining through a multi-employer group; by refusing to meet and bargain separately with Amax before February 3, 1975; by striking without first notifying the Federal Mediation and Conciliation Service about its dispute with Amax; by bargaining to impasse and striking in support of its demands that the Company agree to six contract clauses in violation of Section 8(e) of the Act. 29 U.S.C. § 158(e). The Board also found that the Union did not violate the Act by bargaining to impasse upon several other clauses that the General Counsel had alleged to be nonmandatory or unlawful, and that neither party had engaged in overall bad faith bargaining. Finally, the Board declined to decide whether the Union had violated the Act by insisting upon several other contract clause proposals because the violations had not been alleged in the complaint. The Company has intervened in the proceeding initiated by the Union; the Union has intervened in the proceeding initiated by the Company; and the Board has filed a cross-application for enforcement of its order. The cases have been consolidated for the purposes of briefing and argument.

** Honorable Donald E. Ziegler of the United States District Court for the Western District of Pennsylvania, sitting by designation.

Because we hold that the management trustee of this Union's pension and welfare fund is a collective bargaining representative within the meaning of Section 8(b)(1)(B), we conclude that the Union violated the Act by striking to obtain Amax's participation in the fund whose management trustee is not selected by Amax. We also conclude that the Union bargained to impasse on two clauses that were not mandatory subjects of bargaining. Accordingly, the Company's petition for review will be granted and the Board's cross-application for enforcement of its order will be denied insofar as they relate to the trust fund representatives and to the "enabling" and "coal lands" clauses. The Union's petition for review will be denied.

## I. FACTUAL BACKGROUND

Amax Coal Company, a division of Amax, Inc., is in the business of operating coal mines, primarily bituminous coal mines in the midwestern United States. It bargains with the United Mine Workers of America (the Union or the UMWA) for its midwestern mines as a member of the Bituminous Coal Operators Association (BCOA). In 1972, Amax opened the Belle Ayr Mine in Gillette, Wyoming, its first sub-bituminous surface mine, and agreed to a contract with the Union covering that mine. The contract contained most of the same terms as the national BCOA contract. The BCOA contract, and the similar contracts signed by the western surface mines, were scheduled to terminate on November 12, 1974.

In 1974, the Union decided to seek contract terms for the western mines that would depart significantly from the BCOA's present contract terms. The Union proposed that a multi-employer bargaining group be formed by the western mining companies. Those companies that agreed to

bargain through a multi-employer association were to be granted sixty day extensions of their contracts. Amax's request for this sixty day extension was rejected by the Union. Additionally, the Union made clear that it viewed Amax as a member of the multi-employer bargaining association and warned that "[i]f you don't get into this association, you are going to have problems everywhere. You know how coal miners are." App., at 38a. Amax thereafter filed the initial unfair labor practice charge in this case alleging, *inter alia*, that the Union's refusal to bargain separately with Amax violated the Act.

Amax made two more unsuccessful attempts to initiate bargaining with the Union. On January 11, Amax negotiators hand-delivered a new contract offer to UMWA's General Counsel Joseph Yablonski in a last minute effort to avoid the strike scheduled for the next day. Yablonski refused even to meet with them and, on January 12, the Union struck Amax and the other western mines as scheduled. On January 18, Amax sent the Union a telegram requesting negotiations; this request was ignored. Upon learning that the Board's General Counsel intended to seek an injunction against the Union's conduct, Yablonski agreed to meet separately with Amax and to submit to Amax the new contract proposal that the Union had prepared for its other negotiations.[1]

The parties held eight negotiating sessions between February 3 and February 18. Although they reached tentative agreements on more than forty items included in the Union's proposal and the Union agreed to accommodate Amax on several items, the parties remained far apart on many basic issues. Three more unsuccessful meetings were held between February 26 and March 7.[2]

1. The proposal was submitted to Amax and to the multi-employer bargaining group, the Peabody Group, on January 24, and to the Pittsburgh & Midway Coal Company (P & M) about a week earlier. The Union had broken off negotiations with the Peabody Group on January 15 because of lack of progress, but had continued negotiating with P & M.

2. During the February 26 meeting, the Union submitted as its new contract proposal the agreement it had reached with the Peabody Group on February 22. On March 4, the parties met with a federal mediator. The Union suggested that a "memorandum of understanding" be used to clarify the intent of some contractual provisions and to accommodate

· On March 14, Elkins Payne, Amax's Vice-President, and Daniel Gruender, Amax's attorney, met with Daniel Edelman, the Union's negotiator, and presented him with a complete contract proposal, which Payne stated was Amax's final offer.[3] Payne stated that this was a package proposal, and that the Union must either accept or reject the entire package. He also emphasized that unless the Union agreed to accept the entire final proposal by the close of the business day on March 17 Amax would consider the proposal rejected and would proceed to implement its terms.

The Union's bargaining council did not begin considering Amax's proposal until the afternoon of March 17 and had not reached a final decision by the end of the day. Amax considered the Union's failure to accept the proposal as a rejection. Within the next week, the Belle Ayr Mine was again in operation under the terms of Amax's final proposal. On April 11, the Union formally rejected Amax's proposal.

The parties had only one negotiating session during the three months following Amax's implementation of its final proposal. Although all of the major issues were discussed during this meeting on May 28, no progress was made.[4] Neither party made any concessions.

Following an unofficial discussion in June with Amax Vice-President Roger Sonnemann, Yablonski submitted a new contract proposal to the Company on July 1, that contained concessions in almost every area of dispute. The new proposal did not, however, compromise the Union's position on the termination date, the pension and welfare funds, or the reinstatement of strikers.

On July 17, Yablonski sent a telegram to Amax Board Chairman Ian MacGregor with a copy to Payne, expressing his frustration at having heard nothing from Amax's negotiators since he had submitted the new contract proposal. The telegram further stated that if no agreement was reached by July 22, the date set for an Amax stockholders meeting, the Union intended to file antitrust charges against Amax with the Federal Trade Commission. Payne agreed to meet with Yablonski on July 21.

Little was accomplished at the negotiations on July 21 and 22. Amax continued to reject all but a few relatively minor items in the Union's new proposal. On the afternoon of July 22, the Union filed charges with the FTC; Union representatives also picketed Amax's stockholders meeting and voiced their complaints about the negotiations during the meeting. Although negotiations resumed on August 7 and 8, they again proved unproductive. On August 18 and 19 Yablonski and Payne exchanged telegrams accusing each other of responsibility for the negotiating deadlock.

Negotiations continued sporadically through the fall and winter of 1975. On November 14 the Union made a new contract offer containing more concessions. The parties made no progress toward an agreement, however, and negotiations ended in February, 1976 amid reciprocal accusations of bad faith.

## II. COLLECTIVE BARGAINING REPRESENTATIVES

### A. Coercion of Amax to Join the Peabody Group

Section 8(b)(1)(B) makes it an unfair labor practice for a union "to restrain or

---

any peculiar conditions at the Belle Ayr mine. Amax Vice-President Elkins Payne met separately with Union negotiator Daniel Edelman on March 7 to explore further the possibility of using a "memorandum of understanding" to iron out some of their differences.

3. The new proposal modified more than forty sections of Amax's previous proposal to conform to the Peabody contract and changed additional sections to agree substantially with it. The remainder of the new proposal was virtually unchanged and those new items were minor.

4. The Union would not compromise its demand for a common expiration date with the Peabody contract or its insistence on the Union's multi-employer pension fund. Amax's position was that the Union should be interested in the level of benefits, and that the administrative arrangements should be left to the Company. Both parties disagreed on the question of reinstating strikers, and Amax continued to object to the clauses in the Peabody contract that it believed to be unlawful.

coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining . . .." 29 U.S.C. § 158(b)(1)(B). The Board found that "by attempting to compel [Amax] to relinquish its right to negotiate independently and instead negotiate through a multi-employer association, the Union engaged in a classic example of the type of conduct which Congress sought to proscribe in enacting Section 8(b)(1)(B) of the Act." 238 N.L.R.B. No. 214 at 12–13. (footnote omitted). Substantial evidence supports this conclusion.

On November 2, 1974, Arnold Miller, the Union's President, sent identical letters to each of the twelve western mining companies whose employees were represented by the Union, explaining the Union's new approach to western bargaining and proposing that the mining companies execute "a single successor Sub-bituminous and Lignite Agreement." App., at 353a(iii). The letters also stated, "Contingent upon your assent to our proposal, the UMWA offers to extend the present Agreement with your company for a period of sixty days beyond November 12, 1974." *Id.*

On November 6, Hollie Hopper, Amax's President, responded that Amax would be unable to bargain with the Union until the Board disposed of a representation petition at the Belle Ayr Mine filed by another union. A few days later, Amax Vice President Payne telephoned Miller's assistant, Ed James, to confirm this position. Payne told James that Amax preferred to bargain independently for the Belle Ayr Mine, and asked whether it could receive the sixty day contract extension without joining the multi-employer group. James replied that unless Amax joined the employer association it would not get the two months extension; but he promised to look into the possibility of extending Amax's contract until after the pending representation election. The

Union subsequently notified Amax that it would extend the contract thirty days, to December 12.

On November 23, the day after the UMWA won the representation election at the Belle Ayr Mine, Payne drafted a letter to the Union, for Hopper's signature, to explain the conditions under which Amax would consider joining the multi-employer association, the Peabody Group.[5] However, because he felt he could better explain in person his concerns over the amount of influence Amax would exert within the Peabody Group, Payne arranged for a meeting with Union officials instead of mailing the letter.

On November 25, Payne and Hopper met with James and UMWA's General Counsel, Yablonski. Payne explained that Amax was reluctant to join the Peabody Group because it felt that the Group's voting procedures were unfair to it.[6] At the end of the meeting Payne said that after Amax discusses its problems with the Peabody Group it would notify the Union whether or not it would join the Peabody Group. Later that day, Payne mailed the letter he had drafted on November 23, without changing the date on the letter. The letter stated that Amax was "considering participation" in the Peabody Group, and requested that Miller sign and return a copy of the letter thus indicating his agreement with the following three conditions: another extension of Amax's contract to January 12, 1975; an individually executed contract covering only the Belle Ayr unit; and the retention of Amax's right to bargain independently in the future. App., at 362a–63a. The letter stated further that after Miller's confirmation was received, Amax would contact the Peabody Group in order to "resolve any other problems" relating to Amax joining the Group. After signing the November 23 letter, Miller telegraphed Amax that he had

---

5. Four of the western mining companies had agreed to the Union's proposal and formed a multi-employer bargaining group, called "the Peabody Group", after its largest member, the Peabody Coal Company.

6. Voting in the Peabody Group was weighed according to the amount of coal currently produced by each mine. Amax's vote would be based on its current output of about 500,000 tons, even though it would be producing almost 20 million tons before the contract term ended.

signed the "letter of agreement" and was extending Amax's contract to January 12, 1975.

After receiving Miller's telegram, Payne informed Yablonski that Amax had been unable to come to terms with the Peabody Group and thus intended to bargain separately for the Belle Ayr Mine. The Company and Union representatives then discussed their respective contract objectives, and Amax agreed to provide information requested by the Union. At the conclusion of the meeting, Amax Vice President Sonnemann reiterated Amax's decision to bargain independently. Yablonski acknowledged this statement by nodding his head.

Payne wrote to Yablonski the next day confirming the tentative arrangements made at the meeting concerning the upcoming negotiations for the Belle Ayr Mine. Having received no reply to his letter, Payne phoned Yablonski on December 30 and was informed that Yablonski considered Amax to be a member of the Peabody Group.[7] Payne immediately telegraphed Yablonski that Amax intended to "bargain with the UMWA for the Belle Ayr Mine operation independently." App., at 368a.

On January 6, 1975, a UMWA delegation headed by International Vice President Michael Trbovich met with Amax's bargaining team. Each party's proposal differed substantially from the others' and each sought significant changes from the terms of the 1971 contract. After discussing the Union proposal, the meeting adjourned.

James Marketti, Director of western organizing for the Union, opened the January 7 meeting by announcing that the Union would not negotiate a separate contract for the Belle Ayr Mine and that they were meeting separately with Amax for informational purposes only and not to negotiate. He stated that Amax would be bound by any contract executed by the Peabody Group. An argument on this question ensued, after which the parties agreed to review Amax's proposals without waiving

their positions on bargaining. At the end of the meeting, Marketti stated that the Union would strike Amax when the contract extension expired January 12 unless the Union reached agreement with the Peabody Group, and he warned Payne, "If you don't get into this association, you are going to have problems everywhere. You know how coal miners are." In response to an inquiry whether this was a threat to strike Amax's midwestern mines, Trbovich stated, "You know exactly what we are talking about." App., at 38a, 64a. On January 8, Yablonski confirmed by letter the Union's refusal to bargain separately with Amax stating:

> The UMWA expressly and unequivocally rejects your purported withdrawal from the Peabody Group, and we expect you to be bound by any agreement which we may reach in those negotiations.

App., at 368a(ii).

Despite this, the Union argues that its conduct was lawful because it contends Amax joined the Peabody Group on November 23 and thereafter failed to serve adequate notice of withdrawal prior to the commencement of multi-employer negotiations on December 20, 1974. We disagree.

 First, the test of membership in a multi-employer bargaining group is whether the employer has "indicated from the outset an unequivocal intention to be bound in collective bargaining by group rather than individual action." *NLRB v. Dover Tavern Owners' Assn.*, 412 F.2d 725, 727 (3d Cir.1969) *quoting Western States Regional Council No. 3 v. NLRB*, 130 U.S.App.D.C. 176, 179, 398 F.2d 770, 773 (D.C.Cir.1968). The Board found that the November 23 letter did not indicate an unequivocal intention to be bound by group action since it predicated Amax's participation in the Peabody Group on two independent conditions: 1) that Miller agree to the three conditions stated in the letter and 2) that the Peabody Group agree to a satisfactory arrangement for allocation of voting rights within the

---

7. Negotiations between the Union and the Peabody Group began on December 20, 1974. The

Union presented no evidence that the Peabody Group ever claimed to represent Amax.

Group. The second condition was not fulfilled. The Board's findings are supported by substantial evidence.

Second, the Board found that even if Amax agreed to be bound by the multi-employer negotiations on November 23, Payne's December 18 letter plainly stated Amax's intention to bargain individually with the Union for a separate contract covering only the Belle Ayr Mine. Since Amax clearly disassociated itself from the Peabody Group in timely fashion, the Union's subsequent strike, which was designed to force Amax to join the Peabody Group, violated Sections 8(b)(1)(B) and 8(b)(4)(A).[8] 29 U.S.C. §§ 158(b)(1)(B), 158(b)(4)(A).

■ Finally, substantial evidence supports the Board's conclusion that the Union's refusal to negotiate with Amax from January 7, 1975 to February 3, 1975, while insisting that Amax would be bound by the Peabody negotiations, violated Section 8(b)(3). 29 U.S.C. § 158(b)(3).

### B. Trust Fund Representatives

■ Amax argues that the Union's conduct in insisting to impasse and striking subsequently to obtain Amax's participation in the Union's pension and welfare trust funds, whose management trustee is not selected by Amax, is coercion in the selection of a representative for the purposes of collective bargaining in violation of Sections 8(b)(1)(B) and 8(b)(3). We are thus asked to decide whether employer trustees of a Section 302(c) Taft-Hartley Trust are collective bargaining representatives within the meaning of Section 8(b)(1)(B). The Board, relying on its decision in *Central Florida Sheet Metal Contractors Assoc., Inc.*, 234 N.L.R.B. No. 162 (1978), held that the trust fund's management trustee is not a collective bargaining representative within the meaning of Section 8(b)(1)(B).

In *Central Florida*, the Board concluded that the trustees of a jointly administered, multi-employer trust fund are solely fiduciaries, owing undivided loyalty to the benefi-

ciaries of such a plan, and are not, therefore, collective bargaining representatives. The Board expressly referred to and rejected this Court's decision in *Associated Contractors of Essex County, Inc. v. Laborers Int. Union*, 559 F.2d 222 (3d Cir. 1977). 234 NLRB at 1247 n.31.

In *Associated Contractors*, this Court considered whether the Taft-Hartley Act's objective of equal representation by employer and employee trustees on the board of welfare and pension funds "is thwarted when the employer trustees represent two rival associations." 559 F.2d at 223. We held that the equal representation clause was violated when trustees, representing a rival association not a party to the original trust agreement, were added to the board without the consent of the original employer association. The amendments in that case were found to create the potential for abuse and combination of alliances placing the union in a dominant position—four were union trustees, two were original employer trustees, and two were employer rival trustees.

This Court, through Judge Rosenn, reviewed the law of equal representation. Relying on *Arroyo v. United States*, 359 U.S. 419, 425–26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959), we noted that Section 302 was enacted to prevent "the possible abuse by union officials of the power which they might achieve if welfare funds were left to their sole control." 559 F.2d at 226. Thus, the requirement of equal employer-employee representation in the joint administration of trust funds was central to the congressional scheme set forth in Section 302. The Court stated:

> The starting point for analysis must be the candid recognition that the relationship between employer and employee trustees of an employee benefit trust fund is quasi-adversarial in nature. Naturally, the trustees of such a trust fund function are fiduciaries for the funds' beneficiaries but they also serve as repre-

---

8. Section 8(b)(4)(A) proscribes strikes and other coercive conduct by Unions where "an object thereof is—(A) forcing or requiring any

employer . . . to join any . . . employer organization . . .." 29 U.S.C. § 158(b)(4)(A).

sentatives of the parties who appoint them. Insofar as it is consistent with their fiduciary obligations, employer trustees are expected to advance the interests of the employer while employee trustees are expected to further the concerns of the union in the ongoing collective bargaining process between them. *See Lamb v. Carey*, 162 U.S.App.D.C. 247, [251,] 498 F.2d 789, 793 (1974); *Toensing v. Brown*, 374 F.Supp. 191 (N.D.Cal.1974), *aff'd*, 528 F.2d 69 (9th Cir. 1975); Goetz, *Developing Federal Labor Law of Welfare and Pension Plans*, 55 Cornell L.Rev. 901, 921 et seq. (1970). The trustees' efforts to improve the position of the parties they represent are completely legitimate—indeed, they are essential to the operation of section 302(c)(5). Congress envisioned the conflict of views of employer and employee as a distilling process which would provide safeguards against trust fund corruption.

559 F.2d at 227–28.

The logic and holding of this court's opinion in *Associated Contractors* are equally applicable to the facts of this case. Accordingly, we hold that the Union's conduct in insisting to impasse and striking to obtain Amax's participation in the Union's pension and trust fund violates Sections 8(b)(1)(B) and 8(b)(3).

### C. *Joint Training Committee*

■ The Board concluded that the Union did not violate Section 8(b)(1)(B) or 8(b)(3) by insisting to impasse for the establishment of a committee to develop adequate safety training programs for employees. Amax argues that because the Joint Training Committee would have members appointed by other western mining companies, the Union's demand for the committee was an attempt to coerce Amax in the choice of its collective bargaining representatives. Because the Committee's function is merely advisory, they are not collective bargaining representatives within Section 8(b)(1)(B).

Article XV of the Union's January 27 contract proposal provided for the establishment of a Joint Western Surface Mining Industry Training Committee composed of three union representatives and three em-

ployer representatives "appointed by the Employers." It further provided that each side would also assign a full time "trained representative" to assist "the Committee and the employers signatory hereto in developing and implementing the various training programs provided for herein." The Article also set forth the types of training programs required with minimum standards for each, specifically providing that each program "shall be developed by the Employer [Amax]." App., at 105a.

The Board reasonably concluded that since the contract clause specifically reserved to the particular employer involved the right to develop the actual training program to be implemented at its mine the function of the Joint Committee must be merely advisory. Although the training programs referred to in Article XV, Sections (b)–(f) of the Union proposals are to have certain minimum standards, they are all programs in which Amax was in control, with power to put the programs into effect or not. The training representatives have no power to do more than advise and recommend.

Amax also raises the same issues with regard to the Mine Health and Safety Committee. Article III(c) states, "[T]he Union and Employer shall jointly establish and fund a course of health and safety training for members of the Mine Health and Safety Committee . . . The training program shall be established by the Joint Western Surface Mining Industry Training Committee." App., at 106a. The Board concluded that Article III(c)(2), even if not properly before it, should be interpreted consistently with Article XV and thus there is no question that the committee members are not collective bargaining agents. Moreover, the Safety Committee is composed of employees chosen by the Union and Section 8(b)(1)(B) prevents the Union from interfering in the selection of the employer's bargaining representative—not the union's. Accordingly, we will not disturb the Board's order on this issue.

### D. *The District Agreements*

■ Article I of the Union's contract proposal would have carried forward any Dis-

trict Agreements to which Amax was a party.[9] Amax argues that this clause violates Section 8(b)(1)(B) because it requires Amax to accept as its bargaining representative persons representing associations of other employers in other units who negotiated or would negotiate changes in the District Agreements. The Board concluded that the Union had not insisted on this clause to impasse and therefore there was no violation. Substantial evidence supports this finding.

On January 6, Amax negotiators objected to this proposal believing it would bind Amax to agreements negotiated by other employers in the area, the contents of which Amax had no knowledge. On February 26, however, Union negotiator Edelman produced copies of the District Agreements for the Amax negotiators and assured them that since Amax was not a party to any of them, the proposed contract clause would have no effect upon Amax. During his March 7 meeting with Payne, Edelman offered to reduce this assurance to writing in the form of a memorandum of understanding that would be included as an addendum to the contract. Although the Union left the proposed clause on the table until November 14, there was almost no further discussion of it, and neither party thereafter indicated that it was a significant problem.

## III. NONMANDATORY CONTRACT PROPOSALS

### A. Coal Lands and Enabling Clauses

Amax argues that the Union bargained to impasse on two clauses that were not mandatory subjects of bargaining and thus violated Sections 8(a)(5) and 8(b)(3). The Enabling Clause would require Amax, during the term of the Belle Ayr contract, to agree to the same contract terms for any of its other sub-bituminous mines whose employees selected the UMWA to bargain for them.[10] The Coal Lands clause made it clear that Amax would have to do this for other facilities whether they were already in operation at the time the Belle Ayr contract was signed or were acquired and put into production during the term of the Belle Ayr contract.[11] The Administrative Law Judge (ALJ) held the two clauses were nonmandatory subjects of bargaining. Relying on its decision in *UMWA and Lone Star Steel Co. and Surface Industries, Inc.*, 231 N.L.R.B. No. 88 (1977), the Board disagreed and held the clauses to be mandatory subjects and held that the Union's insistence to impasse on them was not in violation of 8(b)(3). It stated:

In view of the foregoing, we conclude that both the enabling clause and the application-of-contract clause merely seek to preserve the employment opportunities of the employees in the existing unit by ensuring that the employees of any other operation put into production by the Charging Party during the term of the proposed agreement, for whom the Union has obtained bargaining rights, will receive the same wages and benefits as the employees at the Belle Ayr Mine. In this manner, as the Board noted in *Lone Star Steel Company*, both clauses serve to "re-

---

**9.** District Agreements are local agreements between a district of the Union and a local group of employers.

**10.** The Enabling Clause provided:
 This agreement . . . covers the sub-bituminous coal or lignite mines owned or operated by [Amax].
In the November proposal, the coal lands clause was deleted entirely and the Enabling Clause was changed to read:
 This agreement covers [Amax's] Belle Ayr Mine and all other western sub-bituminous and lignite mines, coal lands, coal producing and coal preparation facilities, owned or operated or held under lease by it, or by any

subsidiary or affiliate at the date of this Agreement, or which may hereafter (during the term of this Agreement) be put into production or use on the leases attached hereto as Addendum A.

**11.** The Coal Lands Clause provided:
 (f) . . . this agreement covers the operator of all coal lands, coal producing and coal preparation facilities owned or held under lease by [Amax], or by any subsidiary or affiliate at the date of this agreement or acquired during its term which may hereafter (during the term of this agreement) be put into production or use.

mov[e] the economic incentive which might otherwise encourage [the Charging Party] to transfer . . . work to other mines under its control." Thus, it is manifest that both of the disputed proposals have a vital effect upon the terms and conditions of employment of the employees at the Belle Ayr Mine and therefore constitute mandatory subjects for bargaining.

App., at 49a(iii)–(iv).

We cannot agree. Whether these clauses are mandatory subjects of bargaining depends on whether they come within the area of "wages, hours and other terms and conditions of employment." *See NLRB v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). Unlike wages and conditions of employment, the scope of the certified bargaining unit is not a mandatory subject and insistence to the point of impasse on restriction or expansion of the bargaining unit is an unfair labor practice. *Hess Oil & Chemical Corp. v. NLRB*, 415 F.2d 440 (5th Cir. 1969), *cert. denied*, 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970). The clauses at issue here would require Amax to conduct negotiations on a basis broader than the certified unit. They would require Amax to bargain about wages and other conditions of employment of employees in other units. While the Union has a valid concern in protecting the employees against a shift of production to another mine in order to evade the Union's standards and wages at Belle Ayr, the clause here refers to all new operations and is much broader than necessary to accomplish this goal. Indeed the clause requires that the agreement be put into effect *in toto* elsewhere, including the non-economic provisions that have no bearing on unit employees.

We have reviewed the record and also conclude that there are sufficient facts to support the finding that the clauses were bargained to impasse. Although there is a fine line between work preservation and bargaining unit expansion, the ALJ was correct in finding a violation of Section

8(b)(3) and thus the Board's order on this issue will not be enforced.

B. *The Exemptions Clause; the 1950 Pension Trust; the Exclusion of Local 1854*

Amax argues that the Union violated Section 8(b)(3) by insisting to impasse that Amax accept its proposed exemptions clause, that Amax contribute to the Union's 1950 Pension Fund, and that Local 1854 not be a signatory party to the contract. These issues are plainly not before this Court, however, because the Board declined to decide either whether the parties reached impasse on these issues, or whether there would be a violation even if they did reach impasse on them. The only question before the Court with respect to these proposals is whether the Board abused its discretion in declining to decide these issues because the General Counsel did not include them in the complaint. In the circumstances of this case the Board's refusal to decide these issues was well within its broad discretion to control the fairness of its own proceedings.

The facts are as follows. The complaint in this case alleged violations of Section 8(b)(3) for insisting to impasse on nonmandatory proposals, and then specifically stated each proposed clause that was alleged to have been insisted to impasse; the three clauses at issue here were not mentioned.

Paragraph 17(k) of the complaint alleged bad-faith bargaining. During the first two days of the hearings the Union objected to evidence that was being offered to show certain contract proposals as nonmandatory, but had not been so alleged in the complaint. Because of the quantity and complexity of the issues involved, the ALJ made it very clear that the Charging Party, Amax, and the General Counsel would be strictly limited to the allegations in the complaint. Thereafter, the General Counsel's motion to amend the complaint specifically to include additional illegal and nonmandatory contract proposals was granted. These three disputed clauses were not in this amendment. The General Counsel was also permitted to amend paragraph 17(k) to allege overall bad-faith bargaining. How-

ever, paragraph 17(k) was not amended for the purpose of being a catchall for allegations not specifically named in the complaint as nonmandatory subjects. Thus paragraph 17(k) of the Board's complaint reads:

Respondent has refused to bargain in good faith with the employer, has engaged in surface bargaining, has negotiated with the employer in bad faith, has exhibited a predetermined resolve not to agree to any proposal but their own, and has insisted upon including nonmandatory and unlawful clauses in any collective bargaining agreement.

■■■ Although evidence was received on the Union's bargaining position about these proposals, these issues were not fully litigated. Thus, under the circumstances, it was not unreasonable for the ALJ to conclude that the Union had not received adequate notice and to decide these issues would deny the Union a fair trial. *See Boyle's Famous Corned Beef Co. v. NLRB,* 400 F.2d 154, 163 (8th Cir. 1968) ("General Counsel's position . . . would not be consonant with administrative due process or fundamental fairness [because] . . . [where] specific acts violative of the section are enumerated, the proof and subsequent findings should be limited to those matters, absent amendment.")

## IV. *CONTRACT PROPOSALS VIOLATIVE OF SECTION 8(e)*

Section 8(b)(4)(A) makes it an unfair labor practice for a union to engage in a strike or other coercive conduct where "an object thereof is . . . forcing or requiring any employer . . . to enter into any agreement" which is prohibited by Section 8(e). A union violates its bargaining duty under Section 8(b)(3) if it insists to impasse that an employer agree to a clause which violates Section 8(e). *See NLRB v. Wooster Division of Borg-Warner,* 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). The Board found that the Union bargained to impasse and struck in support of six proposed clauses which the Board found to violate Section 8(e).

Section 8(e) makes it "an unfair labor practice for any labor organization and any employer to enter into any contract or agreement . . . whereby such employer ceases or refrains or agrees . . . to cease doing business with any other person." In determining whether the particular clauses here violate Sections 8(e) and 8(b)(4), we must inquire into "whether, under all the surrounding circumstances, the Union's objective was preservation of work for [Amax's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere." *National Woodwork Mfrs. Assoc. v. NLRB,* 386 U.S. 612, 644, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967).

### A. *Successorship Clause*

The Union proposed a clause that would require Amax to condition any sale or conveyance of its operations upon the successor's assumption of Amax's obligations under the agreement. This "successorship clause" provided:

[T]his Agreement shall be binding upon all signatories hereto and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this agreement. Provided that the Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement.

The Board concluded that this proposal was lawful, both because the transfer of a portion of Amax mining operations to a successor does not constitute "doing business" within the meaning of Section 8(e), and because the effect of the clause was primary.

■■■ The phrase "doing business" refers to a continuing business relationship which

is capable of being discontinued by one employer in order to force another employer to accede to union demands. *National Woodwork Mfrs. Assoc. v. NLRB*, 386 U.S. at 619–633, 87 S.Ct. at 1254–1262. Thus, as noted earlier, Section 8(e) was designed to protect neutral employers and their employees, not involved in a labor dispute, from being pressured to assist a union in a dispute with another employer.

Here, it is clear that the sale by Amax of all or part of its business operations would involve no continuing relationship with the purchaser. There is therefore no possibility of involving Amax in a labor dispute between the purchaser and its employees.

Amax argues, however, that the trading of dormant coal land is a common practice in the coal industry and that the successorship clause would affect adversely Amax's freedom to carry on this allegedly necessary activity. The ALJ found otherwise:

Amax . . . operates several mines in the midwest, not covered by the contract negotiations involved in this case, but operates only one western mine, the Belle Ayr Mine. However, Amax owns or leases substantially more parcels of coal land than those which make up the Belle Ayr Mine and its midwestern mines. Amax continually purchases coal lands but "seldom sells" coal lands, rather it continually trades coal lands which it owns or leases for coal lands owned or leased by other coal producers. The reason for this is that, since many of the parcels or coal leases acquired by Amax are small and noncontiguous, it is essential for Amax to trade these parcels for others in order to put together a large enough contiguous block of land to support a "viable mining plan," one which will enable Amax to use its land to produce coal. In this regard, the record es-

tablishes that Amax does not use its coal lands to produce or process coal unless the area is large enough to support 15 or 20 years of mining operations. *It is a fair inference, from the aforesaid circumstances, that Amax's trading of its coal lands involves noncontiguous parcels not used by Amax to produce or process coal since they do not constitute a "viable mining plan." It is also a fair inference that coal lands which constitute a viable mining plan such as the parcels which comprise the Belle Ayr Mine and other facilities which are being used to produce or process coal are seldom if ever traded by Amax.*

App., at 122a. (emphasis added).

 After reviewing the record, we conclude that the ALJ's findings regarding the frequency and nature of lands traded by Amax are supported by substantial evidence.[12]

 Moreover, even if the conveyance of a portion of Amax's coal mining operations, which is restricted by this clause, constituted "doing business" within the meaning of Section 8(e), the successorship clause is nonetheless lawful because its effect is primary. The clause was clearly designed to assure that Amax's own employees would retain their current contractual benefits in the event that their place of employment is sold to a new employer. The only obligation which the clause would place on Amax is to secure the purchaser's agreement to adopt the contract *before* Amax sells the mining operation to the purchaser—that is, while the employees are still Amax's employees. Once the mining operation is actually transferred, the clause would permit the Union to seek compliance only from the new employer, who would have stepped into Amax's shoes and thus become the primary employer of Amax's

---

12. The Company's attempt to stretch the Enabling and Coal Lands clauses to apply the Successorship clause to Amax's dormant coal lands must fail. Under the Enabling and Coal Lands clauses, the contract would only become effective with respect to those coal lands which Amax put "into production" during the term of the contract, and then only after the UMWA

became the recognized bargaining representative at the new facility, a development which obviously cannot occur until Amax has employees working there. And as Amax concedes, until its trading of coal lands has successfully resulted in a "viable mining plan," it has "no reason to hire miners to dig coal." Brief at 35.

former employees covered by the contract. In short, since this clause serves to benefit only Amax's own employees, and does not seek to enlist Amax's aid in affecting the labor relations of anyone who is not the employer of those same employees, the effect of the clause is primary.[13]

## B. "Leasing-Licensing Out" Clause

■ The Union next challenges the Board's ruling that the proposed "leasing-licensing out" clause violated Section 8(e) because a transfer under the clause constituted "doing business" within the meaning of Section 8(e). Additionally, the Union argues, that even if such a transfer comes within Section 8(e), it is lawful because, by the very nature of the coal mining business, it is a primary work preservation clause.

The Board's conclusion is correct. The two restrictions on licensing out coal operations effectively control the labor relations of the licensee employer and benefit union members generally rather than Amax's own employees. The union members required to perform do not have to come from Amax. Thus the clause forces the licensee employer to abide by the union recognition portion of the contract. It serves only the union's organizing interests and does not protect the Amax employees' work standards.

On the "doing business" issue of Section 8(e), it is clear that the clause requires a continuing relationship between Amax and the licensee employer that would permit the Union to force Amax to pressure the licensee employer to comply with Union's future demands. Since the clause forbids Amax from licensing out coal mining operations absent compliance with the contract terms for the licensee's employees, Amax would be obliged to discontinue the licensing agreement if the licensee ever stopped recognizing the Union or abiding by the other terms of the Union's contract with Amax.

## C. Coal Transportation Clause

■ The coal transportation clause provided that Amax could subcontract the transportation of its coal "only to a contractor employing members of the UMWA under their agreement." The Board adopted the ruling of the ALJ that the Union violated Sections 8(b)(4) and 8(b)(3) by insisting to impasse and striking to obtain Amax's agreement to its coal transportation clause. We agree.

The clause requires that the subcontractor shall not only agree to provide its employees with the economic benefits of the contract, but to adhere to the noneconomic terms as well. It also provides that Amax may contract out only to contractors who employ Union members. To that extent, the clause seeks to aid UMWA members generally rather than those union members employed at the Belle Ayr Mine. The continuance of the relationship between the signatory employer and any contractor depends on the contractor's decision to employ UMWA as his employees' bargaining representative and not on the contractor's maintenance of union wage scales or conditions. Its effect is therefore secondary and unlawful.[14] See A. Duie Pyle, Inc. v. NLRB, 383 F.2d 772, 777–78 (3d Cir. 1967), cert. denied, 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968).

## D. Repair and Maintenance Work

■ The ALJ found and the Board agreed that the Union's Repair and Maintenance Work Clause proposal violated Sec-

---

**13.** Because the complaint in this case did not specifically allege that the Successorship clause was a nonmandatory bargaining subject apart from its legality under Section 8(e), the ALJ made no finding with respect to that question. The Company's exceptions to the Board relating to the ALJ's findings with respect to the Successorship clause do not question this issue, and because it filed no motion for reconsideration with the Board challenging the Board's subsequent failure to deal with it, Section 10(e), 29 U.S.C. § 160(e), of the Act precludes the Company from raising the issue in this Court.

**14.** The Union argues that the unlawful portion of the clause is severable from the balance of the clause and therefore only that phrase should be stricken. However, since there are no executed contract terms here, there is no illegal agreement to render void and no need to determine whether or not a portion of any contract clause can be lawfully preserved.

tion 8(e). The proposal prohibited contracting out repair and maintenance work customarily performed by classified employees at the mine or central shop unless the work was performed under a manufacturer's warranty or the employer did not have available equipment or regular employees with necessary skills available to perform the work at the mine or central shop, "provided, however, that the work, shall be performed by UMWA members to the extent and in the manner permitted by law." App., at 134a. The Board's decision will be enforced, for as this Court stated in *A. Duie Pyle, Inc. v. NLRB*, 383 F.2d at 777–78:

> The present provisions, to the extent that they require the subcontractees to become employees and members of the union, therefore must also be declared invalid. As in the case of secondary boycotts generally, a union may not employ a collective bargaining agreement with one employer as a means of effectuating its object to coerce another employer to unionize. Nor may it by this means seek to coerce self-employed persons to become union members. Congress had made this clear by § 8(b)(4)(A) which prohibits secondary boycotts with an object of "forcing or requiring any employer or self-employed person to join any labor * * * organization * * *."

### E. Construction Clause

■ The Union proposed a clause that would permit "construction of mine or mine related facilities" to be "performed by such outside contractors as are designated by the Employer." It provided, however, that when such work was contracted out, it would be "under the jurisdiction of the UMWA" unless "UMWA contractors qualified to do the work are not available." Additionally, the Union's proposal specified that if a dispute arose over Amax's use of a non-UMWA contractor, Amax would have the burden of proving "that the UMWA contractors qualified to do the work are not available."

For the reasons given in connection with the "coal transportation" and "leasing-li-censing out" clauses, the ALJ concluded that this clause was a "union signatory" agreement which violated Section 8(e). We agree. This clause prohibits Amax from subcontracting to a non-UMWA subcontractor even if he maintains working conditions equivalent to Amax's. It only serves the Union's own interest in making sure the subcontractor recognizes the Union, and does not provide any benefit to Amax's employees.

### F. Work Jurisdiction Clause

■ The Union's work jurisdiction clause specified that "contracting, subcontracting, leasing and subleasing and construction work" would be "conducted in accordance with" the requirements of other clauses. The Board found that to the extent that this clause would require Amax to comply with the other clauses found to be illegal, the work jurisdiction clause was equally unlawful. We agree. Since the work jurisdiction clause incorporates the other illegal clauses, it likewise violates Section 8(e).

## V. FAILURE TO NOTIFY THE FEDERAL MEDIATION AND CONCILIATION SERVICE

Section 8(d)(1) prohibits a party to a collective bargaining agreement from modifying or terminating the agreement without serving written notice on the other party sixty days prior to the expiration date. Sections 8(d)(3) and (4) require a party to a collective bargaining agreement to notify the Federal Mediation and Conciliation Service (FMCS) within thirty days after such notice of the existence of a dispute and to refrain from striking within the sixty days after such notice has been given. Although Section 8(d)(1) specifically mentions written notice and Section 8(d)(3) does not, the FMCS regulations do require written notice. 29 C.F.R. § 1402.1.

■ The Board found that the UMWA failed to give oral or written notice to the FMCS as required by Section 8(d)(3) and therefore violated Section 8(b)(3) of the Act by striking without complying with Section 8(d). The UMWA argues that there was

implicit written notice, that even if no written notice was given, none is required under the statute, that oral notice was given, and that even if no oral notice was given, actual knowledge of the dispute is sufficient. Substantial evidence supports the findings that there was no written or oral notice.

On September 11, 1974 and October 17, 1974, the Union notified the Federal Mediation and Conciliation Service by letter that it was terminating the 1971 National Bituminous Coal Wage Agreement and that it intended to bargain with the employers who were parties to those agreements, either as members of the relevant employers' association or as independent signatories. Attachments to the letter of September 11, 1974 specifically referred to the Union's negotiations with the BCOA—the employer association that negotiated the National Bituminous Coal Wage Agreement—and with the Association of Bituminous Contractors and included sample form letters addressed to "All Independent Signatories" of the 1971 Agreement and the 1972 Coal Mine Construction Agreement. Nothing was said, however, concerning the existence of a contractual dispute between the Union and Amax over the Belle Ayr Mine. The Union concedes that its letter and attachments never specifically mention the dispute with Amax over the Belle Ayr Mine. Brief of UMWA at 69. It argues, however, that Section 8(d)(3) does not require written notice. Nonetheless, even if this were a correct interpretation of Section 8(d)(3), there is virtually no evidence to support the Union's allegation of oral notification. The evidence referred to only indicates an informal chat between an FMCS mediator and Yablonski without specific mention of Belle Ayr. As a result, the Board was correct to conclude that it was unnecessary to decide whether written notice was required because no oral notice had been given.

■ Finally, the Union argues that even if it failed to give the FMCS any notice of the Belle Ayr dispute, Section 8(d)(3) is satisfied if the FMCS independently obtained "actual knowledge" of the dispute from other sources. We disagree. Nothing in the statute or in the relevant case law relieves the Union of its statutory duty to notify the FMCS. The purpose of Section 8(d)(3) is "to increase the likelihood that the mediation services will have sufficient time to intervene. The method Congress chose to serve this purpose was to assign to one party, the initiating party, a fixed and definite responsibility for notifying the mediation services." *Hooker Chemicals & Plastics Corp. v. NLRB*, 573 F.2d 965, 970 (7th Cir. 1978). This purpose is not fulfilled when the FMCS happens to find out about a dispute on its own.

## VI. OVERALL FAILURE TO BARGAIN IN GOOD FAITH

■ Amax charged the Union with a failure to bargain in good faith and the Union raised the same claim against Amax as an affirmative defense. The Board held that neither party had engaged in bad faith bargaining. Except for that conduct which we found to constitute violations of the Act, we conclude that as to the remaining issues the Board's finding that neither party engaged in bad faith bargaining is supported by substantial evidence.

## VII.

For the foregoing reasons the company's petition for review will be granted and enforcement of the Board's order will be denied insofar as it relates to the trust fund representatives and to the "enabling" and "coal lands" clauses. The Union's petition for review will be denied.