559 F.2d 222
 95 L.R.R.M. (BNA) 2908, 81 Lab.Cas. P 13,306,
1 Employee Benefits Ca 1286
 ASSOCIATED CONTRACTORS OF ESSEX COUNTY, INC., Sigfried
Higgins, Jr., John Wall, and Archie Ingrassia, Individually
and as Employer Trustees of the Newark Laborers Welfare Fund
and the Newark Laborers Pension Fund, Appellants,
v.
LABORERS INTERNATIONAL UNION OF NORTH AMERICA, the Local
Union Nos. 342, 699 and 112, Newark Laborers Welfare Fund,
and Frank DiGirolamo and Paul Brienza, Individually and as
alleged Employer Trustees thereof, and Michael Mandaglio,
James Brown and James McDonald, Individually and as Union
Trustees thereof, and Michael Giacolone, Individually and as
alleged Union Trustees thereof, and Frank Boscia as
Administrator thereof, Newark Laborers Pension Fund, and
Frank DiGirolamo and Paul Brienza, Individually and as
alleged Employer Trustees thereof.
 No. 76-2011.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 25, 1977.
Decided June 23, 1977.
 
 Vincent J. Apruzzese, Francis A. Mastro, Apruzzese & McDermott, Springfield, N.J., for appellants.
 Oransky, Donovan, Scaraggi & Borg, East Orange, N.J., for Newark Laborers Pension, Welfare Funds.
 Before GIBBONS, FORMAN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 Congress determined thirty years ago when it enacted the Taft-Hartley Act to interdict conduct that would deprive employees engaged in interstate commerce from fair representation in collective bargaining. Motivated by the same social objectives, it also provided for safeguards to maintain the integrity of employee welfare and pension funds. This appeal raises an important question whether the Act's objective of equal representation by employer and employee trustees on the board of welfare and pension funds is thwarted when the employer trustees represent two rival associations.
 
 I.
 
 2
 After many years of collective bargaining between them, the Associated Contractors of Essex County (Associated) and several Locals of the Laborers International Union (hereinafter referred to collectively as the "Union") pursuant to a collective bargaining agreement, entered into two agreements and declarations of trust in 1964 creating the Newark Laborers Welfare Fund and the Newark Laborers Pension Fund.[1] Under the terms of the trust agreements, Associated and the Union were each to designate three trustees and each party retained the right to recall and replace one or more of its designated trustees at any time.
 
 
 3
 Prior to February 1973, the Executive Secretary of Associated was Paul Brienza. Brienza also served as one of the designated Associated trustees on the Welfare and Pension Funds. Associated removed him from both positions whereupon Brienza became instrumental in organizing a rival trade association known as the Building Trades Employers Association (BTEA). On March 7, 1975, BTEA executed its first collective bargaining agreement with the Union and agreed to make contributions to the aforesaid Welfare and Pension Funds. Three days later, March 10, 1975, Brienza, now managing director of BTEA, made a demand of Mandaglio, a union trustee and chairman of the Funds, that BTEA be given representation equal to Associated in view of BTEA's promised contribution to the Funds.
 
 
 4
 A meeting of the Trustees of the Funds was called for March 17 but Associated alleges that no notice of BTEA's demand was furnished to it or to Higgins and Ingrassia, two of Associated's three trustees. Associated alleges that its third trustee, Frank DiGirolamo, whose company, DiGirolamo Construction Company, had joined BTEA, knew of the BTEA demand but elected not to share his knowledge with his fellow trustees. At the March 17 meeting, motions were made to amend the trust agreements to make BTEA a "party" and to expand the board of trustees to eight members, two appointed by Associated, two by BTEA, and four by the Union. Each motion carried by a vote of 4 to 2, DiGirolamo voting in each case with the union trustees.
 
 
 5
 Prior to the next meeting of the Trustees on March 24, DiGirolamo was replaced as an Associated trustee by Wall. At the meeting, however, DiGirolamo showed up together with Brienza and both were seated as employer trustees representing BTEA. The two amendments to the trust agreements as formally drafted by counsel were put to a vote at a subsequent meeting on April 3 and adopted by a vote of 6 to 2; Brienza and DiGirolamo voted in favor of the amendments together with the union trustees. At the April 3 meeting, the trust agreements were further amended by the same 6 to 2 vote to provide that six trustees would constitute a quorum with the further proviso that at least two of the six were employer trustees and two union trustees.
 
 
 6
 Shortly thereafter, Associated together with Higgins, Wall, and Ingrassia sought declaratory and injunctive relief in the United States District Court for the District of New Jersey, naming as defendants the Union, Brienza and DiGirolamo, the two trust funds, the three union trustees, the additional alleged union trustee, and the administrator of the funds. Jurisdiction was alleged under sections 301 and 302 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. §§ 185, 186 (1970) and 28 U.S.C. §§ 2201-02 (1970).
 
 
 7
 The plaintiffs prayed that the court declare[2] the amendments to the trust agreements and the actions taken pursuant thereto illegal and void under the terms of the trust agreements themselves as well as under the equal representation requirement of section 302(c)(5)(B) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5)(B).[3]
 
 
 8
 Following cross-motions for partial summary judgment, the district court held in a letter-opinion that the challenged amendments did not violate the terms of the trust agreement and that they were validly enacted. Finding also that the plaintiffs "ha(d) failed to raise any genuine issue of material fact" necessitating trial of their claim that the challenged amendments violated the equal representation clause, the court entered partial summary judgment for the defendants. This appeal followed.
 
 II.
 A. Jurisdiction
 
 9
 We are obliged to meet an important threshold question of subject matter jurisdiction, although neither the parties nor the district court raised the issue, Cutler v. Rae, 48 U.S. (7 How.) 729, 12 L.Ed. 890 (1849), particularly since the scope of section 302 jurisdiction still remains controversial.[4]
 
 
 10
 Section 302 takes the form of a broad prohibition of payments of money or other thing of value by employers to representatives of employees. An exception is made, however, in subsection (c)(5) for employee benefit trust funds that meet certain rigid standards, among which is a unique feature requiring equal representation for employers and employees in the administration of the funds. Subsection (e) of section 302 grants district courts jurisdiction "to restrain violations of this section, . . . ." Although the extent of the jurisdiction under section 302(e) is not yet settled,[5] this much is certain: a federal district court does have jurisdiction under the section to enforce a trust fund's compliance with the statutory standards set forth in subsection (c)(5) by eliminating those offensive features in the structure or operation of the trust that would cause it to fail to qualify for a (c)(5) exception. Arroyo v. United States, 359 U.S. 419, 426-27, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); Nedd v. UMW, 556 F.2d 190 at 201 n.18 (3d Cir. 1977); Blassie v. Kroger Co., 345 F.2d 58 (8th Cir. 1965). Since plaintiffs in the instant case alleged inter alia a structural violation of the equal representation clause of subsection (c)(5)(B), the district court was justified in the exercise of its jurisdiction.
 
 
 11
 In addition to alleging a subsection (c)(5) violation, however, plaintiffs also claim that the amendments to the trust agreements are invalid on two other grounds: (1) that they were not properly adopted, and (2) that even if properly adopted, they are void under Article X of the agreements and declarations of trust which prohibits amendments that exceed the "original purposes" of the trust agreement.[6] These two claims, grave as they appear to be, do not purport to rest on any federal statute. Thus, jurisdiction over them is problematic.
 
 
 12
 Some authorities suggest that section 302(e) vests the federal courts with broad, equity jurisdiction over the operation and administration of 302(c)(5) trusts.[7] The majority position, however, to which this circuit subscribes, does not find in section 302 a grant of jurisdiction board enough to reach plaintiffs' non-statutory claims in the instant case.[8] On the other hand, since plaintiffs have stated one claim over which federal jurisdiction is clear, the district court in its discretion might have exercised pendent jurisdiction over the non-statutory, state law claims. See Snider v. All State Administrators, Inc., 481 F.2d 387 (5th Cir.) rehearing denied, 481 F.2d 1403 (1973), cert. denied, 415 U.S. 957, 94 S.Ct. 1484, 39 L.Ed.2d 571 (1974). We therefore acknowledge the possibility of district court jurisdiction over the plaintiffs' state law claims, but we do not find it necessary to reach them on appeal for reasons which will subsequently become clear.
 
 B. The law of equal representation
 
 13
 Section 302 was enacted to prevent "the possible abuse by union officials of the power which they might achieve if welfare funds were left to their sole control." Arroyo v. United States, 359 U.S. 419, 425-26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959); accord, United Marine Div. v. Essex Transp. Co., 216 F.2d 410, 412 (3d Cir. 1954); Moyer v. Kirkpatrick, 265 F.Supp. 348 (E.D.Pa.1967), aff'd 387 F.2d 955 (3d Cir. 1968) (per curiam). Since the governing trust agreement usually delegates broad powers and discretion to the trustees, it is conceivable that the exercise of such powers "may involve important questions of policy or judgment on which union and employer trustees may well differ." Goetz, note 7 supra, 55 Cornell L.Rev. at 922. The requirement that employers and employees be equally represented in the joint administration of trust funds is thus central to the Congressional scheme set forth in section 302. Any amendment to a trust fund agreement which even slightly restructures the representation of employers and employees in the fund administration must be carefully scrutinized, not merely for technical compliance with the statutory standard but for meaningful adherence to the Congressional command. Only by subjecting the amendments here at issue to such scrutiny can we eliminate erosion of the thoughtful safeguards Congress built into this social legislation.
 
 
 14
 Our task is to examine the challenged amendments not only in their present form but, more importantly, as to their probable future effect. The question we must pose is whether the amendments, if allowed to stand, will permit union control of the carefully guarded structure which houses the fair and sound administration of trust funds. Some courts and commentators have concluded that the goal of equal representation in the administration and control of trust funds is defeated if the union in any degree participates in the choice of employer representatives, Quad City Bldrs. Assoc. v. Tri City Bricklayers Union No. 7, 431 F.2d 999 (8th Cir. 1970); Blassie v. Kroger Co., 345 F.2d 58 (1965); that the equal representation clause is violated by any arrangement which creates the possibility of union domination, Quad City Bldrs. Assoc., supra ; and, indeed, that the essence of equal representation is that each side have veto power on any proposed action. Goetz, Employee Benefit Trusts Under Section 302 of the Labor Management Relations Act, 59 Nw.L.Rev. 719, 747-50 (1965). We agree with such views. If we determine that the arrangements challenged in the case sub judice violate these principles of equal representation, they cannot be saved by BTEA's claim to representation on the Funds because of its contributions to them: not every party contributing to a welfare and pension fund has a right to select the fund's trustees. See, e. g., Blassie v. Kroger Co., supra; Local 169, Int'l Brotherhood of Teamsters v. Teamsters Health & Welfare Board, 327 F.Supp. 260 (E.D.Pa.1971); Goetz, supra, 59 Nw.L.Rev. at 747.
 
 
 15
 The district court's entry of partial summary judgment on the equal representation claim was predicated on its finding that no instances of union abuse of the trust funds have been shown by plaintiffs. We believe, however, that partial summary judgment cannot be based on such a finding. The question before the district court was not whether there had been union abuse of the trust funds under the amendments, or even whether there would be, but rather whether union domination of the fund is "a very real possibility." Quad City Bldrs. Assoc. v. Tri City Bricklayers Union No. 7, 302 F.Supp. 1031, 1035 (S.D.Ia.1969) aff'd and quoted in, Quad Bldrs. Assoc., supra, 431 F.2d at 1003. "Inherent in such domination is the possibility of abuse which section 302 was enacted to prevent." Id. at 1035. If the amendments here at issue create the potential of abuse by effectively placing the union in a position of control or dominance, they cannot be allowed to stand, even if the union's conduct thus far has been irreproachable. Section 302 is designed to prevent future misconduct, not merely to remedy past misdeeds. Quad City Bldrs. Assoc., supra; Local No. 2, Operative Plasterers v. Paramount Plastering, Inc., 310 F.2d 179 (9th Cir. 1962); United Marine Div. v. Essex Transp. Co., supra.
 
 C. The Challenged Amendments
 
 16
 Measured against these standards, the amendments to the Newark welfare and pension funds are plainly illegal. Even if the Union's dominant position is not apparent on the face of the amendments, elementary analysis ineludibly demonstrates the potential of Union domination as the inevitable consequence of the amendments' operation. The starting point for analysis must be the candid recognition that the relationship between employer and employee trustees of an employee benefit trust fund is quasi-adversarial in nature. Naturally, the trustees of such a trust fund function as fiduciaries for the funds' beneficiaries but they also serve as representatives of the parties who appoint them. Insofar as it is consistent with their fiduciary obligations, employer trustees are expected to advance the interests of the employer while employee trustees are expected to further the concerns of the union in the ongoing collective bargaining process between them. See Lamb v. Carey, 162 U.S.App.D.C. 247, 498 F.2d 789, 793 (1974); Toensing v. Brown, 374 F.Supp. 191 (N.D.Cal.1974), aff'd, 528 F.2d 69 (9th Cir. 1975); Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L.Rev. 901, 921 et seq. (1970). The trustees' efforts to improve the position of the parties they represent are completely legitimate indeed, they are essential to the operation of section 302(c)(5). Congress envisioned the conflict of views of employer and employee as a distilling process which would provide safeguards against trust fund corruption.
 
 
 17
 The arrangement of trustees contemplated by the challenged amendments, however, would impair the delicate balance between employer and employee trustees and thereby destroy the effectiveness of this safeguard. The Congressional objective in maintaining the integrity of the welfare and pension funds by an evenly balanced representation between union trustees and their employer counterparts would be endangered. While the union trustees could be expected to address fund problems with a strong common voice, representatives of two rival employers' associations could be expected, particularly in light of the experience here, to speak in discordant or diluted voices. In a contest of wills, the union trustees might find their employer counterparts divided and readily subjugated. This is not to say that the views of trustees appointed by different employers will always diverge to give the union trustees effective control on every issue. In the instant case, however, the record demonstrates and the district court so found, that Associated and BTEA are avowed rivals. In view of the sequence of events we have chronicled, it is evident that little love is lost between Associated's former and now BTEA trustees Brienza and DiGirolamo, on the one hand, and the two Associated trustees and Associated itself on the other. Thus, even if in other circumstances, a board composed of four union trustees representing a single union and four employer trustees representing two different trade associations might possibly comply with the equal representation clause of subsection (c)(5), we hold that that clause is violated when employer trustees representing a rival association not a party to the original trust agreement are added to the board without the consent of the original employer association.
 
 
 18
 Where employer trustees represent rival associations, especially when the associations are hostile to each other and personal enmity exists between the associations' trustee representatives, the possibility of abuse is high. Assume, for example, that the trustees of the Newark funds are called upon to vote on a proposal which employers would normally oppose and union officials usually favor. Rather than simply voting against the proposal, BTEA's vote would likely be determined by balancing the intensity of its opposition as an employer toward the proposal against the degree of its enmity with Associated. On some issues, BTEA might well regard a vote for a pro-union proposal as a fair price to pay for the adverse effects upon Associated. In this kind of malaise, the well-being of the beneficiaries of the funds is sacrificial bait. And, of course, the reverse is also possible: Associated would find itself subject to the same conflict of motivations. The result would necessarily be to increase the power of union representatives as against the employer representatives at the expense of the balance designed for the protection of employee beneficiaries of the fund.
 
 
 19
 Equal danger would be posed by a proposal toward which the union is neutral but as to which Associated and BTEA have differing views. The Union might be tempted to cast its controlling votes with Associated in exchange for Associated's promise to vote with the Union on a subsequent pro-union motion which Associated would otherwise be expected to oppose. And again, the reverse is equally possible. The situation is fraught with mischief and manipulation.
 
 
 20
 The problem is only exacerbated by the amendment providing for a quorum of six trustees. If that amendment were allowed to stand, business could be conducted even in the absence of any Associated trustees. The danger is not that BTEA might advance its own position vis-a-vis Associated (or vice-versa) for section 302 is not concerned with such rivalries; the danger is that the quorum provision, like the other amendments, places the union in the powerful position of a power broker.
 
 
 21
 In the instant case, some specific dangers to the stability of the Funds and the equal representation of employer and union trustees quickly surface. Under the original agreement and declaration of trust, Associated had the exclusive power to remove any or all employer trustees it found objectionable "with or without cause at any time." Under the new amendments, it can only remove two of the four employer designated representatives. Since in most matters action is by simple majority, factionalism among employer trustees readily permits a unified body of union trustees to dominate a controversial issue. Instead of requiring a joint administration by all employer and union trustees, the amendments allow decisions solely by union representatives and representatives of BTEA. Under the original agreement, Associated could appoint half of the total number of trustees; under the amendments, it can only appoint or remove one-fourth.
 
 
 22
 We realize that the record does not establish that an evil alliance has been or will be forged between BTEA and the Union, or between the Union and Associated. The proposed new structure of trustees, however, makes such an alliance possible. That possibility carries with it a very real threat of union domination and union abuse which the equal representation clause was designed to foreclose and which we cannot ignore. Under the controlling legal standards set forth above, that potential for union abuse is sufficient reason to strike down the amendments.[9] We therefore hold that the challenged amendments are invalid under the equal representation clause of section 302(c) (5).
 
 IV.
 
 23
 Having held the amendments invalid under section 302(c)(5), we need not consider the additional claims of invalidity based on violations of the agreements and declaration of trust themselves and the state law of trusts, notwithstanding the possibility of exercising pendent jurisdiction over them.
 
 
 24
 The judgment of the district court will be reversed and the case remanded to the district court with directions to grant plaintiffs' motion for partial summary judgment declaring the amendments to the trust agreement and declarations of trust illegal under Section 302(c)(5).
 
 
 25
 GIBBONS, Circuit Judge, concurring and dissenting:
 
 
 26
 I agree completely with Judge Rosenn's analysis of the legal and factual issues in this case, but I do not agree with his proposed judgment. He remands with a direction that the plaintiffs' motion for partial summary judgment be granted. I do not think the case is ripe for summary disposition. Certainly on this record partial summary judgment in favor of the defendants should not have been granted. And certainly, as Judge Rosenn's opinion ably demonstrates, the events which resulted in a dilution of the voting power of the original employer representative show a strong possibility that a combination of alliances between competing interests could result in the union domination of the fund. That, of course, is the evil against which the legislation is directed. I do not read Judge Rosenn's opinion as laying down a per se rule against changes in the makeup of the trustees to reflect either new union constituency or new management contributors, but I fear his opinion will be misunderstood. While the dangers of union domination appear to be strong in this instance, I do not think they are so overwhelming that the necessity for injunctive relief should be decided on summary judgment. I would remand for a hearing, and for findings of fact as to the likelihood of union domination by virtue of the division among the employer representatives. Judge Rosenn rejects a standard that would require a finding of an actual evil alliance before relief can be granted, and I agree that so strict a standard of proof would be inappropriate. But the mere possibility of such an alliance, in my view, imposes too low a threshold for injunctive relief. Congress, after all, settled on equal representation as the appropriate safeguard. I would require a finding that the new arrangement poses a substantial threat rather than a possible danger to the equal representation safeguard. Although the case for meeting the substantial threat standard on the papers before us is a strong one, it does not, I think, meet the requirements of Fed.R.Civ.P. 56 and 65.
 
 
 
 [1]
 All members of the Building Contractors Association of New Jersey, a statewide organization consisting of approximately 300 general contractors and subcontractors, subscribe to and are bound by the collective bargaining agreement between Associated and the Union and the agreements and declarations of trust creating the welfare and pension funds involved in this litigation
 
 
 [2]
 Other items in the prayer for relief and the court's disposition thereof are not relevant to this appeal
 
 
 [3]
 Section 302 in pertinent part provides:
 (a) It shall be unlawful for any employer or association of employers . . . to pay, lend, or deliver . . . any money or other thing of value
 (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
 (2) to any labor organization, or any officer or employee thereof, which represents . . . any of the employees of such employer who are employed in an industry affecting commerce; or
 (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
 (b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.
 (c) The provisions of this section shall not be applicable . . . (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents . . .: Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, . . . .
 (e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of Title 28 (relating to notice to opposite party) to restrain violations of this section . . . .
 
 
 [4]
 We have also considered the question of standing and hold that an employer does have standing to bring an action to correct a subsection (c)(5) violation. See Employing Plasterers' Assoc. of Chicago v. Journeymen Plasterers' Protective and Benevolent Soc., 279 F.2d 92, 97-99 (7th Cir. 1960); cf. Mechanical Contractors Assoc. of Philadelphia v. Local Union 420, 265 F.2d 607 (3d Cir. 1959)
 
 
 [5]
 See notes 7 and 8, infra, and accompanying text
 
 
 [6]
 Plaintiffs contend that one of the "original purposes" of the agreements was to further the collective bargaining relationship between Associated and the Union. This purpose is necessarily violated, argue the plaintiffs, by the seating of trustees who represent a third party such as BTEA. On the question of the extent to which an employee benefit trust fund functions as part of the collective bargaining agreement, see Alvares v. Erickson, 514 F.2d 156, 161 (9th Cir.) cert. denied, 423 U.S. 874, 96, S.Ct. 143, 46 L.Ed.2d 106 (1975); Lamb v. Carey, 162 U.S.App.D.C. 247, 498 F.2d 789, 793 cert. denied, 419 U.S. 869, 95 S.Ct. 128, 42 L.Ed.2d 108 (1974); United Brick & Clay Workers v. Int'l Union of Dist. 50, UMW, 439 F.2d 311 (10th Cir. 1971); Toensing v. Brown, 374 F.Supp. 191, 195 (N.D.Cal.1974), aff'd, 528 F.2d 69 (9th Cir. 1975). But cf. United Marine Div. v. Essex Transp. Co., 216 F.2d 410 (3d Cir. 1954)
 
 
 [7]
 See, e. g., Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425 (1968); American Bakeries v. Barrick, 162 F.Supp. 882, 883 (N.D.Ohio 1958) aff'd 285 F.2d 426 (6th Cir. 1960); Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L.Rev. 911, 928-29 (1970). The leading exposition of this view is probably that of Judge Magruder in Copra v. Suro, 236 F.2d 107 (1st Cir. 1956) (dictum), but Judge Magruder's view was substantially rejected subsequently in Bowers v. Ulpiano Casal, Inc., 393 F.2d 421 (1st Cir. 1968)
 
 
 [8]
 See, e. g., Haley v. Palatnik, 509 F.2d 1038 (2d Cir. 1975); Bowers v. Ulpiano Casal, Inc., 393 F.2d 421 (1st Cir. 1968); Blassie v. Kroger Co., 345 F.2d 58 (8th Cir. 1965); Mechanical Contractors Assoc. v. Local Union 420, 265 F.2d 607 (3d Cir. 1959); Burroughs v. Bd. of Trustees, 398 F.Supp. 168 (N.D.Cal.1975) aff'd 542 F.2d 1128 (9th Cir. 1976), cert. denied, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); Nixon v. O'Callaghan, 392 F.Supp. 1081 (S.D.N.Y.1975); Lugo v. Employees Retirement Fund of Illum Prod. Indus., 366 F.Supp. 99 (E.D.N.Y.1973); Insley v. Joyce, 330 F.Supp. 1228 (N.D.Ill.1971); Moyer v. Kirkpatrick, 265 F.Supp. 348 (E.D.Pa.1967), aff'd 387 F.2d 955 (3d Cir. 1968) (per curiam); Holton v. McFarland, 215 F.Supp. 372 (D.Alaska 1963); Sanders v. Birthright, 172 F.Supp. 895 (S.D.Ind.1959); Moses v. Ammond, 162 F.Supp. 866 (S.D.N.Y.1958). Cf. Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959)
 
 
 [9]
 Judge Gibbons would require a finding that the new trustee structure poses a "substantial threat" to the equal representation safeguard. Even if we were to apply that standard, we would conclude that sufficient evidence had been adduced in the instant case to establish such a "substantial threat" and we would still direct the district court to grant plaintiffs' motion for partial summary judgment