INTERNATIONAL LONGSHORE-MEN'S ASSOCIATION–AFL–CIO, LOCAL 1575, represented by its President, and the Royalty Fund Mechanized Cargo Local 1575, represented by its Trustee, Carlos Ortiz Velazquez, Plaintiffs, Counter–Defendants

v.

HORIZON LINES OF PUERTO RICO, INC., represented by its President, Gabriel Cerra, Defendant, Counter–Claimant.

Civil No. 06–2034(FAB).

United States District Court, D. Puerto Rico.

Oct. 11, 2007.

Carlos Rodriguez–Garcia, San Juan, PR, for Plaintiffs, Counter–Defendants.

Antonio M. Cuevas–Delgado, Cuevas Kuinlam & Bermudez, Hato Rey, PR, Lisabel M. Rodriguez–Espinosa, San Juan, PR, for Defendant, Counter–Claimant.

## OPINION AND ORDER FOLLOWING BENCH TRIAL

BESOSA, District Judge.

On October 11, 2006, the International Longshoremen's Association–AFL–CIO, Local 1575 ("ILA"), represented by its President, Carlos Ortiz–Velazquez ("Ortiz–Velazquez"), and the Royalty Fund Local Mechanized Cargo International Longshoremen Association Local 1575 (the "Royalty Fund"), represented by its Trustee, also Ortiz–Velazquez, filed this complaint against Horizon Lines of Puerto Rico, Inc. ("Horizon"), represented by its president Gabriel Cerra ("Cerra"), seeking a declaratory judgment terminating the Royalty Fund and that all its assets, after a financial audit and payment of all outstanding debts, be transferred to a new trust fund, and that the employer trustee

be terminated retroactively (Docket No. 1). On November 29, 2006, Horizon answered the complaint and filed a counter-claim seeking payment from the Royalty Fund of past and future amounts owed to the employer trustee for services rendered (Docket No. 24). From June 26 to 28, 2007, the Court held a bench trial where it heard evidence and arguments from all parties (Docket Nos. 110–113). Having reviewed the parties' proposed findings of fact and conclusions of law (Docket Nos. 129, 131, 136), the Court now issues its findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The ILA is a union with members in Puerto Rico which affects interstate commerce in the United States of America. The current President of ILA Local 1575 is Ortiz–Velazquez. (Docket No. 118, Page 161, Lines 1–21; Page 162, Lines 1–4)

2. Horizon is a corporation authorized to do business in the Commonwealth of Puerto Rico, and which affects interstate commerce. (Docket No. 118, Page 162, Lines 1–7)

3. Since 1989, Manuel Antonio Lopez–Llavona ("Lopez–Llavona") has been the Director of Labor Relations for Horizon, in charge of negotiating, implementing and administering five different collective bargaining agreements including one with the ILA Local 1575. (Docket No. 121, Page 5, Lines 20–25; Page 6, Lines 1–11)

4. Since 1973 to the present, the parties have been signatories to a series of Collective Bargaining Agreements (CBA) providing for the payment of certain contributions to several funds. (Docket No. 120, Page 71, Lines 22–25; Page 72, Lines 1, 2)

5. The total amount of contributions, known as the benefit package, is negotiated "by the ILA in the States," and then it is decided locally how much of this total amount is to be deposited in which Funds. (Docket No. 120, Page 73, Lines 7–17)

6. There are three (3) different Funds that were created for the benefit of the ILA's members and which are funded with contributions from the Employers. (Docket No. 120, Page 55, Lines 4–7) Two of these funds are the Royalty Fund and the Welfare Fund.

7. The total amount of contributions paid by the Contributing Employers, including Horizon, to these Funds since 1973 is approximately ONE HUNDRED SEVENTY MILLION DOLLARS ($170,000,-000.00). (Docket No. 120, Page 52, Lines 22–25; Page 53, Lines 1–20)

8. Horizon Lines has contributed around 45 to 50 percent of the total amount of the contributions. (Docket No. 120, Page 53, Lines 21–25; Page 54, Line 1)

9. The Royalty Fund was created by a 1993 deed, which substituted the fund created in 1976. (Docket No. 118, Page 48, Lines 21–25 and Page 49, Line 1)

10. The Royalty Fund was funded with contributions from the Employers. (Docket No. 119, Page 36, Lines 1–18)

11. As part of a civil action before this Court, in 2003 ILA and "Sea Land", currently Horizon, agreed and stipulated that, "Horizon will, within 30 days after the signing of this settlement agreement, name a Trustee or Trustees to the Trust Fund in accordance to [sic] Section 302 of the Labor Management Relations Law, 29 USCA section 186, which provides that 'employers and employees (must be) equally represented in the administration of such fund.'" (Civil No. 00–1512, Docket No. 33 at p. 2) The agreement became the judgment of the Court.

12. In September 2003, Horizon appointed Mr. Roberto Ramirez–Gonzalez

("Ramirez–Gonzalez") as Employer's Trustee for the Royalty Fund. (Docket No. 118, Page 25, Lines 3–6)

13. At the time of Ramirez–Gonzalez's appointment, Horizon Lines was a Contributing Employer to the Royalty Fund. (Docket No. 120, Page 20, Lines 18–22) The parties agreed that Ramirez–Gonzalez would be compensated at the rate of $400.00 per month for his services as Employer Trustee. (Civil No. 00–1512(JAG), Docket No. 33 at p. 2)

14. In 2003, when Ramirez–Gonzalez became the Employer Trustee, Mr. Jose Padilla was the Union Trustee. Afterwards, Mr. John Baker ("Baker") became the Union Trustee. Ortiz–Velazquez is the current Union Trustee to the Royalty Fund. (Docket No. 118, p. 130, Lines 10–15)

15. The current Collective Bargaining Agreement between the parties is effective from 2004 to 2010 and was bargained by Mr. Lopez–Llavona on Horizon's behalf and by Mr. Baker as the representative of the ILA. (Docket No. 121, Page 6, Lines 12–20) (Collective Bargaining Agreement, 2004–2010, between Horizon Lines of Puerto Rico, Inc. and Local 1575, International Longshoremen's Association, AFL–CIO, Pages 1, 42)

16. At the time, ILA Local 1575 was in trusteeship by the International Union and Baker was its Trustee. As such, Baker was also the sole Union Trustee in all of the ILA Local 1575's Funds. (Docket No. 121, Page 7, Lines 4–21)

17. During the negotiations for the current CBA, Lopez–Llavona and Baker agreed to transfer to the Union's Welfare Fund the twenty-five cents Horizon was contributing directly to the Royalty Fund, with the understanding that in case the Royalty Fund should need said contribu-tion it would be reverted. (Docket No. 121, Page 8, Lines 2–10)

18. The Current CBA was signed on April 15, 2005 with retroactive effect to October 2004 (Collective Bargaining Agreement, 2004–2010, between Horizon Lines of Puerto Rico, Inc. and Local 1575, International Longshoremen's Association, AFL–CIO, Pages 1, 42).

19. In June 2005—that is, two months after the execution of the current CBA—the trustees of the Royalty Fund passed a resolution (the "June 2005 Resolution") agreeing that the Union and the Employer would have two (2) trustees each in the Royalty Fund's Board of Trustees. Baker and Lopez–Llavona participated in this meeting, as did Ortiz–Velazquez and Ramirez–Gonzalez. (Defendant's Exhibit F, Resolution dated June 29, 2005)

20. Ortiz–Velazquez, ILA Local 1575's President, voted in favor of and signed the June 2005 Resolution. (Defendant's Exhibit F; Docket No. 120, Page 14, Lines 11–25; Page 15, Lines 1–5)

21. Neither Baker—the person who negotiated the CBA—nor Ortiz–Velazquez challenged the standing of the Employer Trustee in the Royalty Fund after the 2004–2010 CBA became effective. (Docket No. 121, Page 8, Line 15 through page 9 Line 6).

22. According to the Royalty Fund's Trust Agreement, once a trustee is appointed by a Contributing Employer, he or she can only be removed "by the party who appoints it [sic]" (Joint Exhibit I, Deed No. 1).

23. The trustees named by the Contributing Employers have kept their seat in the Board of Directors of the different funds even after the employer in question has stopped making monetary contributions to the fund. (Docket No. 120, Page 96, Line 25; Page 97, Lines 1–21) For

example, Mr. Jorge Bringuier ("Bringuier") remained as a trustee of the Welfare Fund and of the Royalty Fund until the year 2004, even though his company had stopped contributing to the funds in 1995. (Docket No. 120, Page 97, Lines 17–21; Page 100, Lines 12–25; Page 101, Lines 1–6) Mr. Anglaria Rosado was a trustee to the Welfare Fund until 1995 when he died, and his company had stopped contributing around 1989 or 1990. (Docket No. 120, 2007, Page 101, Lines 7–17)

24. On June 27, 2006, the Trustees of the Royalty Fund voted to terminate the Royalty Fund and to create a new fund with the name of Guillermo Ortiz Gonzalez Building Administration Fund ("GOG Building Administration Fund.") (Docket No. 118, Page 39, Lines 2–25; Page 40, Lines 3–7)

25. The Minutes of the June 27, 2006 meeting of the Board of Trustees of the Royalty Fund do not reflect that the Trustees voted for the GOG Building Administration Fund not to have an Employer Trustee. (Docket No. 119, Page 64, Lines 7–11)

26. According to the Royalty Fund's Administrator, whose duties include keeping the minutes, the Minutes of the Board of Trustees reflect a summary of all topics discussed during a particular meeting. (Docket No. 120, Page 139, Lines 14–21)

27. The Royalty Fund's Title Deed, Deed No. 1 of 1993, establishes the way in which the Royalty Fund is to be terminated. (Joint Exhibit I, Deed No. 1 of 1993, Section M, p. 11; Pages 52–54). In its pertinent part said provision, states the following:

## M. TERMINATION OF TRUST

a. In the event that the obligations of an Employer ceases or in the event that the Fund is liquidated, the Trustee will continue paying the obligations of the Fund until its complete liquidation.

At the termination of the Fund, the Trustee will notify the Union and the Employers and any other party necessary. In the event of such termination, the Trustees will prepare a final audit with a report of its transactions and accounts.

b. Nothing contained in this Article will be construed to in any way be in conflict with the law and in the event of a conflict the law will prevail.

c. If the Trust created hereby ends for any reason, the Trustee may, at its termination, transfer any remaining monies in the Fund to a new Trust which may be created or previously exists between the parties.

28. The Board of Trustees of the Royalty Fund has not met since October, 2006. (Docket No. 120, Page 116, Lines 7–18)

29. Since October 2006, Mrs. Marcelle Martell–Jovet ("Marcelle–Jovet")—the Fund's General Counsel—has requested, on at least four or five different occasions, a meeting with the Royalty Fund Trustees and has scheduled at least two meetings requested by the Employer's Trustee, all of which were rejected by the Union Trustee, Ortiz–Velazquez. (Docket No. 120, Page 115, Lines 19–25; Page 116, Lines 1–18)

30. According to Ortiz–Velazquez, the liquidation audit of the Royalty Fund is being conducted but has not been concluded. (Docket No. 119, Page 67, Lines 3–7)

31. Ramirez–Gonzalez—Employer Trustee for the Royalty Fund—has not been consulted about any aspect of the liquidation process, including the selection of the auditors who would conduct the liquidation audit. (Docket No. 118, Page 69, Lines 14–21)

32. Ramirez–Gonzalez believes that the best way to achieve a proper liquidation audit is to use a different firm from the one performing the regular audits because, in his experience, it is desirable to have a fresh pair of eyes reviewing if there was something wrong: "it's not the best business practice to have the same people do it." (Docket No. 118, Pages 80, Lines 20–25; Page 81, Lines 1–3)

33. On January 19, 2007, Ortiz–Velazquez signed Deed No. 1 creating the GOG Building Administration Fund. Ramirez–Gonzalez did not appear in Deed No. 1. (Deed number one (1) authorized by Notary Public Attorney Marta I. Ojeda–Rodríguez, on January 19, 2007; Defendant's Exhibit E)

34. As of October 2006, there were more than FIVE MILLION DOLLARS ($5,000,000.00) deposited in the Royalty Fund's bank account at the Banco Popular de Puerto Rico ("BPPR"). (Docket No. 118, Page 131, Lines 5–20)

35. These funds consisted of employers' contributions. (Docket No. 119, Page 36, Lines 1–18)

36. The BPPR account of the Royalty Fund required the authorization by signature of both trustees-Union and Employer-for the withdrawal of funds. (Docket No. 118, Page 133, Lines 5–9)

37. After Ortiz–Velazquez signed the deed to create the GOG Building Administration Fund, he went to BPPR, closed the Royalty Fund's accounts, and transferred the more than FIVE MILLION DOLLARS ($5,000,000.00) to a new account at UBS for the GOG Building Administration Fund. (Docket No. 119, Page 39, Lines 7–21; Docket No. 120, Page 142, Lines 12–22)

38. The Board of Trustees for the GOG Building Administration Fund has three trustees—Ortiz-Velazquez, Ivan Lugo and Tulio Figueroa (Docket No. 119, Page 46, Lines 5–22),—none of which is an Employer Trustee. (Docket No. 119, Page 34, Lines 3–6)

39. The bank account for the GOG Building Administration Fund only requires the authorization by signature of Ortiz–Velazquez and Tulio Figueroa for the withdrawal of funds. (Docket No. 119, Page 50, Lines 2–6)

40. Because the monies transferred to the GOG Building Administration Fund's accounts were the monies in the Royalty Fund's accounts, whatever employer contributions there were in the Royalty Fund's accounts are also in the GOG Building Administration Fund's accounts. (Docket No. 119, Page 39, Lines 7–17)

41. To close the Royalty Fund's bank account and to open the account at UBS for the GOG Building Administration Fund in January 2007, Ortiz–Velazquez used a March 2006 Resolution of the Board of Trustees signed by Ramirez–Gonzalez (the "March Resolution.") (Docket No. 119, Page 40, Lines 15–18)

42. There is no mention of the GOG Building Administration Fund in the March 2006 Resolution. (Docket No. 119, Page 40, Lines 7–10)

43. Ramirez–Gonzalez never authorized the closing of the Royalty Fund's accounts with the purpose of creating a new fund. (Docket No. 118, Page 132, Lines 13–17)

44. No Resolution of the Board of Trustees of the Royalty Fund authorizes the opening of any account for another fund with the monies deposited in the Royalty Fund accounts. (Docket No. 120, Page 142, Lines 23–25; Page 143, Lines 1–2)

45. There is no resolution of the Board of Trustees authorizing the opening of any

account that does not require the signature of an Employer Trustee to withdraw funds. (Docket No. 120, Page 143, Lines 3–7)

46. As shown by the Minutes of the Board of Trustees of March 7 and 30, 2006, the March Resolution was passed because the trustees were concerned about the poor service they received at the BPPR on a previous occasion while they were attempting to make a payment to the power utility company. Accordingly, they wanted to close the BPPR account in order to open a new account at UBS. The Trustees, however, never acted upon this resolution. (Docket No. 118, Page 133, Lines 5–25; Page 134, Line 1; Joint Exhibit III, Minutes of the meeting held by the Board of Trustees on March 7, 2006 and Joint Exhibit IV, Minute of the meeting held by the Boards of Trustees of March 30, 2006)

47. The matter of the liquidation of the Royalty Fund was not brought up either during the March 7th or during the March 30th, 2006 Board meetings, and so is not reflected in the minutes. (Docket No. 119, Page 44, Lines 5–10)

48. Ortiz–Velazquez is the President of the GOG Building Administration Fund. (Docket No. 119, Page 51, Lines 9–12)

49. According to the Deed establishing the GOG Building Administration Fund, Ortiz–Velazquez, as President of the Board of Trustees, can remove any trustee with or without cause from the Board. (Docket No. 119, Page 53, Lines 1–4)

50. The Deed which established the GOG Building Administration Fund does not have an arbitration clause. (Docket No. 119, Page 58, Lines 19–25)

51. The GOG Building Administration Fund's Deed does not contain a clause which obligates that the financial statements of the GOG Building Administration Fund be available to the union members for their inspection. (Defendant's Exhibit H, Deed No. 8 of June 21, 2007 (amendment to Deed No. 1 of January 19, 2007))

52. The GOG Building Administration Fund's Deed does not define with specificity the benefits to which the beneficiaries of the Fund will be entitled. (Defendant's Exhibit E, Deed No. 1 of January 19, 2007)

53. On March 30, 2007, Ortiz–Velazquez circulated a Memo among the tenants of the ILA Building requesting them to pay their rent directly to the GOG Building Administration Fund rather than to the Royalty Fund. (Docket No. 119, Page 74, Lines 4–8; Defendant's Exhibit B–2, Memorandum to the tenants of the ILA Building from C. Ortiz)

54. The Royalty Fund is the title owner of the ILA Building. (Docket No. 118, Page 127, Lines 1–12)

55. The ILA Building was built with employer contributions. (Docket No. 119, Page 132, Lines 1–23)

56. The Landlord in the tenants' lease agreement is the Royalty Fund. (Docket No. 119, Page 78, Lines 8–13)

57. There is no Resolution of the Board of trustees authorizing the transfer of the Royalty Fund's lease agreements to the GOG Building Administration Fund. (Docket No. 119, Page 143, Lines 8–12)

58. By October 2006 all rent payments received were deposited in the Royalty Fund's Banco Popular account. (Docket No. 119, Page 145, Lines 4–25, Page 146, Lines 1–3)

59. Horizon desires to sell the ILA Building as well as the entire Royalty Fund's assets and transfer that money to the Welfare and Pension Fund. (Docket No. 118, Page 103, Lines 13–24)

60. The Pension Fund provides benefits to participants who qualify for the pension. If the participants have elected

the joint survivor option, the surviving spouse receives a percentage of the pension. (Docket No. 120, Page 37, Lines 23–25; Page 38, Lines 1–5)

61. The Welfare and Pension Fund is in a deficit of around 6.6 million dollars annually. (Docket No. 120, Page 39, Lines 14–25; Page 40, Lines 1–2)

62. Even though measures have been taken to reduce the deficit, the Welfare Fund is underfunded by approximately 3.8 to 4 million dollars. (Docket No. 120, Page 49, Lines 15–22)

63. The expected life span of the Pension Fund is approximately ten to eleven years. (Docket No. 120, Page 50, Lines 17–25; Page 51, Lines 1–2)

64. The Trust Agreement of 1993, provides in clause Five (G), the following:

"There would be an impasse of the Trustees when there is no quorum in two consecutive meetings duly summoned or when any matter cannot be decided because of a tie in the votes. Whenever there is an impasse, the Trustees may submit the matter to arbitration before an impartial person selected by the majority of the trustees. If the Trustees cannot agree to arbitrate within five days after the impasse any of the Trustees may request from the United States District Court in Puerto Rico to appoint the arbitrator. The decision of the arbitrator will be final and binding and the costs and expenses of the arbitration will be paid by the Fund".

(Joint Exhibit I, Deed No. 1).

65. Mr. Ramirez is owed approximately $16,800 as of October, 2007, for services rendered as Employer Trustee for the Royalty Fund. (Docket No. 118, Page 139, Lines 1–7)

## CONCLUSIONS OF LAW

1. *ILA Local 1575's Claims*

The Labor Management Relations Act ("LMRA" or "the Act"), 29 U.S.C. §§ 141–187, governs the relations between employers and the unions which represent their employees. The Act specifically prohibits any employer from paying, lending, or agreeing to pay or lend any money or other thing of value to any labor organization or its officers. *See* 29 U.S.C. § 186(a). By way of exception, the LMRA provides that employers can make contributions into a trust fund established by the union "for the sole and exclusive benefit of the employees of such employer, and their families and dependents," provided that,

the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and **employees and employers are equally represented in the administration of such fund,** together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other

places as may be designated in such written agreement.

29 U.S.C. § 186(c)(5) (emphasis added).

"As the statute reads, it appears to be a criminal provision, *malum prohibitum*, which outlaws all payments, with stated exceptions, between employer and representative." *U.S. v. Ryan*, 350 U.S. 299, 305, 76 S.Ct. 400, 100 L.Ed. 335 (1956). "The purpose of the statutory provision for equal employer-employee representation was to protect the interests of the employees from exploitation by unscrupulous union officials." *Denver Metropolitan Ass'n of Plumbing, Heating, Cooling Contractors v. Journeyman Plumbers & Gas Fitters*, 586 F.2d 1367, 1374–1375 (10th Cir. 1978) (*citing Arroyo v. United States*, 359 U.S. 419, 425–426, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959)). "[T]he equal representation clause is violated by any arrangement which creates the possibility of union domination." *Associated Contractors of Essex County v. Laborers Intern. Union*, 559 F.2d 222, 227 (3rd Cir.1977). "[I]ndeed, [ ] the essence of equal representation is that each side have veto power on any proposed action." *Id.* "As part, but only a part, of this statutory scheme, the sole control of trust funds by union officials was proscribed." *Bowers v. Ulpiano Casal*, 393 F.2d 421, 425 (1st Cir.1968).

The trust fund at issue in this case, the Royalty Fund, falls under the LMRA's purview because it was funded through a series a payments made by the employers to the union fund. Although the LMRA specifically prohibits payments between employers and the union, the payment will be lawful if made in accordance with the exceptions found in section 186(c)(5). This would require (1) that the funds be held in trust for the benefit of union members who are employees of the contributing employer; (2) that the details of the payments be contained within a written agreement between the employer and the union; (3) that the employees and the employer have equal representation in the administration of the fund; and (4) that the agreement provide for an annual audit to be conducted of the fund and that the results of the audit be made available to interested parties. *See* 29 U.S.C. § 186(c)(5). The Royalty Fund meets all those requirements.

For purposes of the administration of the fund, the LMRA requires equal representation of employers and employees so that all decisions concerning the fund reflect the will of both parties. The LMRA further provides for the appointment of neutral parties to serve as trustees and cast the deciding vote in the event of a deadlock. If no neutral persons have been appointed as trustees, then the employer and union trustees must agree on an impartial umpire who shall break the deadlock, or petition the district court to name a neutral person if the trustees cannot agree on one. *See* 29 U.S.C. § 186(c)(5)(B). In the case of the Royalty Fund, no neutral persons have been appointed as trustees and the deed which created it requires that all actions be taken by majority vote. (*See* Joint Exhibit I, p. 8).

During a meeting on June 27, 2006, the trustees voted to terminate the Royalty Fund because its purpose, the construction of the ILA Building, had been fulfilled, and to create a new fund, the GOG Building Administration Fund, to continue with the administration of the building. There was no agreement, however, on what they would do with the funds remaining in the Royalty Fund's bank accounts or with its assets.

Without waiting for such agreement between the trustees, Ortiz–Velazquez created the new GOG Building Administration Fund and transferred to it the Royalty Fund's assets without the agreement by

the employer trustee. This act by Ortiz–Velazquez was a clear violation of the LMRA and of the terms of the 1993 deed which created the Royalty Fund. The act amounts to union officials having sole control of the funds, which the LMRA prohibits. No audit was performed prior to the termination of the fund. The act was not taken by majority agreement. Ortiz–Velazquez was required first to obtain the employer trustee's agreement, and failing that, the deadlock should have been submitted to a neutral arbitrator.

Moreover, the GOG Building Administration Fund does not comply with the LMRA's requirements for that type of fund. Because the money which was used to fund the GOG Building Administration Fund is the proceeds of employer contributions to the Royalty Fund, the GOG Building Administration Fund needs to be handled as indicated above in order to avoid falling under the LMRA's prohibition. The most egregious violation of the LMRA in this case is that the GOG Building Administration Fund does not provide for employer representation. This effectively gives the union full control over the funds, a clear violation of the LMRA. Plaintiffs argue that employer representation is not needed in the GOG Building Administration Fund because the employers, by agreement with the union during negotiations for the latest CBA, are no longer contributing to the Royalty Fund. Thus, because they are not contributing employers, they are not entitled to representation in the administration of the fund.

The argument is misguided and contrary to the provisions of the LMRA. Even if the employers are not currently contributing to the Royalty Fund, the money which funds the Royalty Fund came from employer contributions. It is money from the employers. Under plaintiffs' theory, if the union were to request a one-time payment from the employers, it could completely avoid employer participation in the administration of a fund because the employer would cease to be "contributing employers" after that one-time payment is made. The LMRA, however, clearly prohibits such transfers from employers to the union unless one of the exceptions applies. Simply stated, if there is a transfer of funds from the employer to the union, be it a one-time payment or a series of payments, the funds need to be held in trust for the benefit of the employees, with equal representation of employers and employees in their administration.

Therefore, the Court finds that plaintiffs, by their actions, have violated the LMRA and are not entitled to the declaratory judgment they request. The Royalty Fund is still in existence and plaintiffs must comply with the LMRA and their agreement with the employers in order to terminate it. Plaintiffs are ordered to restore to the Royalty Fund all assets previously held by it, including money, property, and all rents which were due to it and were diverted to the GOG Building Administration Fund, including all monies currently on deposit in the UBS account. Plaintiffs are also ordered to inform the tenants of the ILA Building to make their rent payments to the Royalty Fund until it is properly terminated. Plaintiffs are further ordered to comply with all requirements for the termination of the Royalty Fund, especially to come to an agreement with the employer trustee, Ramirez, as to the disposition of the Royalty Fund's assets, or, if no agreement can be reached, to submit the dispute to a neutral arbitrator. Finally, plaintiffs are ordered to terminate the GOG Building Administration Fund and to close the UBS account.

### 2. *Horizon's Counterclaim*

■ Horizon's counterclaim is limited to a request for payment of compensation

owed to the Ramirez for his services as the employer trustee. The 1993 deed creating the Royalty Fund provides for a payment of $400 monthly to the employer trustee for his services. At trial, the testimony presented established that he has not received his compensation and is owed approximately $16,800 as of the date of this opinion.

Having found that the Royalty Fund is still in existence, and that the employer is entitled to appoint a trustee, the Court must find that Ramirez is entitled to payment for his services as stated in the 1993 deed. Accordingly, the plaintiffs are ordered to pay Ramirez the amount of $16,800 up to and including the month of October 2007. Furthermore, plaintiffs are ordered to continue paying Ramirez at the rate of $400 per month for his services as employer trustee until such a time as the Royalty Fund is terminated in accordance with the above discussion or Ramirez is replaced as the employer trustee.

### CONCLUSION

For the foregoing reasons, the Court finds against plaintiffs on their request for a declaratory judgment. Plaintiffs are ordered to restore to the Royalty Fund all assets previously held by it, including money, property, and all rents which were due to it and were diverted to the GOG Building Administration Fund, including all monies currently on deposit in the UBS account. Plaintiffs are also ordered to inform the tenants of the ILA Building to make their rent payments to the Royalty Fund until it is properly terminated. Plaintiffs are further ordered to comply with all requirements for the termination of the Royalty Fund, especially to come to an agreement with the employer trustee, Ramirez, as to the disposition of the Royalty Fund's assets, or, if no agreement can be reached, to submit the dispute to a neutral arbitrator. Finally, plaintiffs are ordered to terminate the GOG Building Administration Fund and to close the UBS account.

Furthermore, the Court finds for the defendant on its counterclaim. The plaintiffs are ordered to pay Ramirez the amount of $16,800 for his services as employer trustee up to and including the month of October 2007. Plaintiffs are further ordered to continue paying Ramirez at the rate of $400 per month for his services as employer trustee until such a time as the Royalty Fund is terminated in accordance with this opinion or Ramirez is replaced as the employer trustee.

Judgment shall enter accordingly.

IT IS SO ORDERED.